UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **YVETTE FELARCA**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **ROBERT J. BIRGENEAU**, *et al.*, <br><br> Defendants. | **Case No.: 11-CV-5719 YGR** <br><br> **ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS CLAIMS AGAINST UC ADMINISTRATORS WITHOUT LEAVE TO AMEND** |

Defendants Robert J. Birgeneau, George Breslauer, Harry Le Grande, Linda Williams, John Wilton, Claire Holmes and Mitchell Celaya (collectively the "UC Administrators") filed their motion to dismiss claims in Plaintiffs' Second Amended Complaint ("SAC"). (Dkt. No. 117.) The UC Administrators seek dismissal of Plaintiffs' civil rights claims under 42 U.S.C. section 1983 for violation of the First Amendment, excessive force and false arrest on the grounds that Plaintiffs have failed to allege facts to establish a viable claim and that the doctrine of qualified immunity bars claims for damages against individual University administrators.

Having carefully considered the papers submitted, the matters appropriately subject to

judicial notice,[1] and the pleadings in this action, and for the reasons set forth below, the UC Administrators' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.

## I.   BACKGROUND

The following is a summary of Plaintiffs' allegations in the SAC.  Plaintiffs allege that defendant Chancellor Robert Birgeneau established the "Crisis Management Executive Team" ("CMET") to have "executive immediate oversight and direction during emergencies involving protests and similar disturbances as required" in close consultation with Birgeneau himself. (SAC ¶ 71.)  Members of the CMET included Executive Vice Chancellor and Provost George Breslauer, Vice Chancellor for Student Affairs Harry Le Grande, Associate Chancellor Linda Williams, Vice Chancellor for Administration and Finance John Wilton, and Associate Vice Chancellor for Public Affairs and Communications Claire Holmes, and University of California Police Department (UCPD) Chief Mitchell Celaya.  (SAC ¶ 71.)  On October 24, 2011, Le Grande received an email indicating that an encampment in solidarity with the Occupy Wall Street movement was planned for November 9, 2011, on the University of California, Berkeley ("UCB") campus.  (SAC ¶ 72.)  Le Grande shared the email with other CMET members.  On November 3, 2011, members of the CMET (Birgeneau, Williams, Breslauer, Celaya, Holmes, and Le Grande) met to discuss the strict

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court generally may not consider matters outside the complaint, except when the court takes judicial notice of matters "central" to the claims as to which no party questions the authenticity of the copies provided.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds in *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002).  The court does not take judicial notice of any disputed facts stated within the documents.  *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).  Moreover, a court should only take judicial notice of those facts in the documents that are both undisputed and relevant to the issues presented in the motion to dismiss.  *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (declining to take judicial notice of documents where they were not relevant to the resolution of the matter).
  The UC Administrators seek judicial notice of fourteen documents in connection with their motion. (Dkt. No. 118.)  The request is **GRANTED** as to Exhibits A, B and C, and **DENIED** as to Exhibits D-N as irrelevant to the motion.
  Plaintiffs submitted a Request for Judicial Notice in connection with their opposition to the instant motion.  (Dkt. No. 157.)  They seek judicial notice of three documents post-dating the events alleged in the complaint.  Their relevance to the matters at issue in the motion is marginal.  The Court **DENIES** the request for judicial notice in its entirety.

2

"no tents" policy that would be enforced for the November 9 protest. (SAC ¶ 75.) Holmes also set up a schedule of conference calls for members of the CMET to convene throughout the day of the protest. (SAC ¶ 74.)

On the day of the protest, Breslauer, Le Grande, Williams, Holmes, Wilton and Celaya are alleged to have been "at the scene on Sproul Plaza" to enforce the "no tents" policy. (SAC ¶ 76.) A protest rally and march proceeded, after which several hundred protestors voted to erect an "Occupy-style" encampment on the lawn near Sproul Hall. (SAC ¶ 82.) Protestors set up about four tents on the lawn. (SAC ¶ 88.) Protestors gathered and linked arms, surrounding the tents, to prevent police officers from removing them. (SAC ¶ 89.)

Around 3:30pm, police officers moved on the crowd of protestors, "pushing with the broad side of their batons, jabbing students with the ends of their batons in students' stomachs, chests, ribs, legs, backs, and groins, using overhand strikes and headlocks, and yanking people out by their hair and arresting them." (SAC ¶ 91.) Plaintiffs allege that the officers were acting under orders from Birgeneau, Breslauer, Celaya and Tejada though a "chain of command." (SAC ¶ 91.) Police indiscriminately arrested people who had been pinned in between the police and the tents and had nowhere to go. (SAC ¶ 94.) Plaintiffs allege that this "afternoon raid," and the beatings by the police officers, continued until about 3:55 p.m., at which point the police retreated. (SAC ¶ 96.)

The conduct of the violent police response to the protest was captured in video recordings that were uploaded to the Internet and viewed by thousands of people within the hours following the afternoon raid. (SAC ¶ 11.) An outraged response drew more protestors and supporters as the day wore on.

Between approximately 4:00 p.m. and 6:00 p.m., Celaya, Williams, and Le Grande met with members of the UCB student government regarding the "no tents" policy. (SAC ¶ 98.) At 4:28 p.m., Breslauer gave a detailed report of the afternoon police raid to Birgeneau via email. (SAC ¶ 99.) At 5:36 p.m., defendant Chancellor Birgeneau, in an email to defendants Breslauer, Le Grande, Williams, and Holmes, stated: "It is critical that we do not back down on our no encampment policy. Otherwise, we will end up in Quan land," a reference to the large, multi-day

3

Occupy encampment in downtown Oakland. (SAC ¶ 100.) By 6:00 p.m., Breslauer had been informed by email that a graduate student was in urgent care and that a professor had been injured by police. (SAC ¶ 101.) At or around 6:15 p.m., Le Grande came to the protestors' General Assembly and read a statement declaring that the administration would allow protesters to stay on Sproul Plaza on the condition that they not have tents or sleeping bags and did not cook food or sleep. (SAC ¶ 102.) If the protestors did not comply with these restrictions, the administration would send in police after issuing a ten-minute warning. (SAC ¶ 102.)

By about 9:00 p.m., hundreds of protesters once again gathered around the protest tents after observing that police were amassing inside Sproul Hall. (SAC ¶ 105.) A large police force approached from the north in riot gear, along with another large force in riot gear stepping out of Sproul Hall's front doors and approaching the protest tents from the south. (SAC ¶ 106.) Defendant UCPD Lieutenant Eric Tejada made an announcement through a bullhorn that was "barely audible" to the police and the crowd, and gave no ten-minute warning. He said that camping was unlawful and to "put down the tents now." (SAC ¶ 108.) Plaintiffs allege that Tejada then "ordered police to march forward, beat people, and make arrests." (SAC ¶ 109.)

The police forced their way to the protest tents, pushing and jabbing people with their batons and using overhand strikes, sometimes aiming at and hitting people's heads. (SAC ¶ 110.) The police action created mass panic among protesters, who tripped over each other in their rush to avoid the police beating. (SAC ¶ 111.) Police beat and kicked people who were lying on the ground, and yanked them behind the police line for arrest. (SAC ¶ 112.) The police arrested people who were between them and the tents, some of whom could not disperse due to the press of the crowd. (SAC ¶113.) Thirty-four protestors in total were arrested that night, five of whom are plaintiffs here. (SAC ¶¶ 113, 117.)[2]

---

[2] Plaintiffs also filed a motion (Dkt. No. 183) after the hearing on the motions to dismiss, seeking to amend the SAC to add two additional paragraphs, as follows:
442a. On November 9, 2011, at 6:56 P.M., the defendant George Breslauer sent an email to a faculty colleague asserting that the University had to remove the protestors because of the nature of their demands. In particular, he stated, in

4

## II. APPLICABLE STANDARD

To avoid a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("*Twombly*")). Although a pleading does not require "detailed factual allegations," plaintiffs must allege "more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The complaint must allege more than "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," or an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Id*. General allegations are "not entitled to the assumption of truth" unless they are backed by sufficiently specific factual allegations. *Iqbal*, 556 U.S. at 679; *see also Ortez v. Washington Cnty.*, 88 F.3d 804, 809-10 (9th Cir. 1996) (affirming dismissal of claims where plaintiff failed to allege overt acts by defendants showing they knew of or participated in activities depriving him of his constitutional rights).

## III. DISCUSSION

### A. EXCESSIVE FORCE AND FALSE ARREST

To state a claim for violation of 42 U.S.C. section 1983 under the Fourth Amendment for use of excessive force, Plaintiffs must allege the amount of force used by a police officer was not

---

> relevant part, that "[t]he level of social inequality in our society is obscene and entrenched; so [the protestors'] main issue does not have a visible end-point of resolution."
> 447a. As set forth in paragraph 447, the plaintiffs believe and thus assert that the defendants Breslauer, Celaya, Le Grande, Williams, Wilton and Holmes witnessed and did not stop the unlawful assaults upon the twenty-nine plaintiffs listed above. In addition, on November 9, 2011, the defendants Breslauer, Holmes, and Celaya all sent emails to colleagues asserting that they had personally witnessed some or all of the police actions on that day.

The Court has considered these additional allegations in connection with its determination of the sufficiency of the SAC in this motion. As stated herein, the Court **GRANTS** the motion and **DIRECTS** Plaintiffs to file an amendment to the SAC adding just these two allegations.

5

objectively reasonable in light of the totality of the circumstances facing the officer, taking into account a range of factors to assess the amount of force used and the governmental interests at stake. *See Graham v. Conner,* 490 U.S. 386, 396; *Moss v. U.S. Secret Service,* 711 F.3d 941, 966 (9th Cir. 2013). "[T]he most important single element" of the *Graham* framework is "whether the suspect poses an immediate threat to the safety of the officers or others." *Moss,* 711 F.3d at 966 (quoting *Chew v. Gates,* 27 F.3d 1432, 1441 (9th Cir.1994)). Thus, in *Moss*, the Ninth Circuit found that the force used was excessive where police officers, without ensuring that a group of protestors had heard a police warning instructing them to move, or giving them adequate time to move, began "violently shoving…, striking them with clubs and firing pepper spray bullets at them." *Moss,* 711 F.3d at 966. The Ninth Circuit so found despite the significant government interest at stake, protection of the President. *Id.*

To allege a claim under the Fourth Amendment for the unlawful "seizure" of a false arrest, the SAC must allege facts showing that the defendant "by means of physical force or show of authority... in some way restrained the liberty of" the identified plaintiffs. *Graham,* 490 U.S. at 395, n. 10 (citing *Terry v. Ohio,* 392 U.S. 1, 19, n. 16 (1968) and *Brower v. County of lnyo,* 489 U.S. 593, 596 (1989)). "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and County of San Francisco,* 266 F.3d 959, 964-965 (9th Cir. 2001). A claim for false arrest against the UC Administrators requires Plaintiffs to "plead facts that would show [they] ordered or otherwise procured the arrests and the arrests were without probable cause." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012). The determination of probable cause is based upon "the totality of the circumstances known to the officers" who make the arrests. *See id*.

Since the UC Administrators are not alleged to have carried out the arrests or use of force directly, Plaintiffs must allege facts to establish a basis for their liability as supervisors. "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, *supra*, 556 U.S. at 677. "Supervisors may not be held liable under § 1983 for the unconstitutional actions of their subordinates based solely on a theory of respondeat superior."

6

*Moss,* 711 F.3d at 967 (citing *Iqbal*, 566 U.S. at 677). Because vicarious liability is inapplicable to Section 1983 suits, plaintiffs must plead that each defendant, through his or her individual actions, has violated the Constitution. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). The Ninth Circuit has held that supervisors may be held liable in a Section 1983 action if there was "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir. 1989). Specifically, the Ninth Circuit has held that supervisors may be liable:

> (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a "reckless or callous indifference to the rights of others."

*Moss,* 711 F.3d at 967 (internal citations omitted).

The UC Administrators argue that the allegations of the SAC are insufficient to hold them liable because there are not sufficient facts to establish supervisor liability for the alleged excessive force and unlawful arrest by the police officers. They argue that Plaintiffs have stated only conclusions, and no specific facts, to connect Birgeneau or any CMET team member to the alleged constitutional violations, to show they had knowledge of police conduct, or to suggest that they directed or participated in the use or force or arrests.

It is true that Plaintiffs have made a number of conclusory allegations in the SAC, including that UC Administrators "ordered," "planned for" or "concurred in" a "police attack on peaceful protestors." Plaintiffs also allege that UC Administrators "concurred in, witnessed and did not stop" forcible assaults and false arrests, and that they did so on account of Birgeneau's opposition to the protestors' political positions and his staff's commitment to implementing that opposition. These conclusory allegations, on their own, would be insufficient to allege claims of liability against the defendants here. *See Moss*, 711 F.3d at 968 (conclusory allegation without specifics as to the action or inaction that caused a constitutional violation insufficient). However, Plaintiffs

7

have also alleged a number of specific facts which, when read together with the other allegations of the SAC, are sufficient to state plausible Section 1983 claims against almost all of the UC Administrators.

On the excessive force and false arrest claims, Plaintiffs have alleged sufficient facts to support a theory of culpability against certain of the administrators based upon their: (1) being aware that of the conduct of the afternoon raid, including that police had injured protestors, under circumstances giving rise to a plausible inference that the response was an excessive use of force; and, nevertheless, (2) ordering police, or allowing them to continue with, a use of force and arrests in the evening raid not warranted under the circumstances.

UC Administrators were all part of the CMET committee charged with "immediate oversight and direction" during the protest in close consultation with Chancellor Birgeneau. (SAC ¶ 71). Members of the CMET were aware of and planned for a police response that involved not just police officers from UCB, but from neighboring UC campuses and the Alameda County Sheriff's Department. They met a number of times prior to the date of the protest to discuss a strict no tents policy and to plan the police response to the protest. Moreover, they communicated with each other during the day of the protest, with the implication that there were sharing information about what was occurring on the ground and how to respond. The allegations of the SAC give rise to a reasonable inference that nearly all of the CMET members were aware of the police response and the resulting injuries during the afternoon raid. There are specific allegations establishing that they were present on the campus and/or communicating with students, other protestors, and each other. The allegations also give rise to a reasonable inference that they saw or communicated what was recorded in the video footage of the afternoon raid. Thus the allegations of the SAC give rise to a plausible claim that, by the evening, it was or should have been obvious to the UC Administrators what would be the likely result of Birgeneau's directive that they "not back down" on the no-encampment policy: a violent response from the police that would lead to excessive use of force and false arrest by the officers under their control.

Birgeneau was at the head of the chain of command for the police response to the protest.

8

Despite being away from the campus, Birgeneau was monitoring the events in consultation with Breslauer, and emailing directions to the CMET concerning the ongoing police response. The allegations of the complaint indicate that Birgeneau was aware of injuries to protestors and the use of batons by police during the events of the afternoon raid. He emailed Breslauer, Le Grande, Williams and Holmes after the afternoon raid to tell them that "[i]t is critical that we do not back down on our no encampment policy," without any apparent qualification or mention of those injuries. (SAC ¶ 100.) These injuries suggest that he knowingly refused to control or stop the police conduct which he knew or reasonably should have known would cause those officers to inflict constitutional injuries.

      The allegations against Breslauer show that he was the administrator in charge while Birgeneau was away from the campus, and reported to Birgeneau during the course of the day to keep him informed of the events of the protest. He had been informed of injuries to a graduate and a professor by police during the afternoon raid. He was aware that police had used batons on the protestors. Plaintiffs also allege that in the early evening a colleague expressed concerns to Breslauer that the police could not handle the protest without resort to violence, based upon what had occurred during the afternoon raid. (SAC ¶ 103.) Despite this knowledge, Plaintiffs allege that Breslauer followed Birgeneau's instruction not to "back down." Like Birgeneau, Breslauer took no action to control or stop the police conduct after learning what had taken place in the afternoon raid.

      Celaya, as chief of the UC police, was also part of the CMET meetings and planning prior to the day of the protest. Accordingly to the allegations, Celaya was the commander of the police force on the ground during the protest. Holmes, Williams and Celaya were on CMET conference calls throughout the day of the protest, monitoring the police response and events. (SAC ¶ 74.)[3] Celaya, Le Grande, and Williams met with members of UCB student government between 4pm and

---

[3] According to the additional allegations of Plaintiffs asserted in their Motion for Leave To Amend (Dkt. No. 183), Breslauer, Holmes, and Celaya all sent emails to colleagues indicating that they had personally witnessed some or all of the police actions that day.

6pm, after the afternoon raid, regarding the "no tents" policy. (SAC ¶¶ 98, 102.) Despite each defendant's knowledge of the actions that had occurred during the afternoon raid, and their roles of authority in controlling the response to the police protest, they took no action to stop or restrain the police.

As to Wilton, it is not clear from the non-conclusory allegations that he was present on campus or otherwise aware of the actions occurring on the day of the protest. Plaintiffs do not plead any details to give rise to a reasonable inference that Wilton knew what was happening at the time and failed to respond. Likewise, Plaintiffs did not articulate or proffer any additional facts at the hearing or in their subsequent motion to amend in this regard. Without additional specific facts, the conclusory allegations that he "witnessed" violence and arrests or was "at the scene" (SAC ¶¶ 5, 76) lack sufficient plausibility.

The UC Administrators argue that the facts here are similar those the Ninth Circuit found in insufficient to allege supervisory liability in *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012). In *Chavez*, plaintiffs alleged that U.S. Border Patrol agents repeatedly stopped the shuttle that they operated, and that these actions were in violation of their Fourth Amendment rights. *Id*. The plaintiffs sued the agents who stopped them, and also sued the agents' supervisors. *Id.* at 1105-06. The Ninth Circuit discounted as "wholly conclusory" the plaintiffs' allegation that the supervisors "'personally reviewed and, thus, knowingly ordered, directed, sanctioned or permitted' the allegedly unconstitutional stops." *Id.* at 1110. The Ninth Circuit noted that plaintiffs had not alleged why the alleged general responsibilities would lead to a conclusion that the supervisors knew about the impropriety of the stops. *Id.* at 1110-11. Unlike *Chavez*, the allegations here are not limited to "wholly conclusory" statements. Instead, the specific facts alleged in the SAC, as stated above, lead to an inference that the defendants were aware of the actual police conduct during the afternoon raid, and did not take action to stop that conduct.

Defendants also argue allegations that certain administrators were aware of the violence and injuries from the afternoon raid, but did nothing, are not enough to establish supervisor liability. They argue that Plaintiffs must allege *repeated* failure to act to abate *repeated* constitutional

violations in order to establish reckless or callous indifference, citing *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011). The Ninth Circuit's holding in *Baca* was that, where a supervisory official had notice of deaths and injuries due to culpable actions of subordinates, and of systematic problems in the jails under his authority which resulted in those deaths and injuries, yet took no action, that official could be held liable under section 1983. *Id.* Nothing in the Ninth Circuit's decision in *Baca* indicates that the notice to the supervisor must be over a long period of time or be repeated in order for a plaintiff to allege liability for failure to act.

In short, the facts alleged, taken as a whole, and the reasonable inferences arising therefrom, are sufficient to support a theory that Birgeneau, Breslauer, Celaya, Le Grande, Holmes, and Williams each "knowingly refused to terminate" conduct by the police officers on the scene which they "knew or reasonably should have known would cause [those officers] to inflict constitutional injury" on the Plaintiffs. *Moss,* 711 F.3d at 967. As such, the allegations of the SAC are sufficient to state section 1983 claims against Birgeneau, Breslauer, Celaya, Le Grande, Holmes, and Williams.

**B. FIRST AMENDMENT CLAIM**

To state a section 1983 claim based upon First Amendment viewpoint discrimination, Plaintiffs must allege some governmental regulation or restriction that facially distinguishes between types of speech or speakers on the basis of the viewpoint expressed, or that application of a facially neutral regulation is motivated by the desire to suppress a particular viewpoint. *Moss*, 711 F.3d at 959. Content-based discrimination and viewpoint-based discrimination are presumptively unconstitutional under the First Amendment. *United States v. Playboy Entm't Group,* 529 U.S. 803 (2000); *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger,* 515 US at 829. "A restriction on speech is viewpoint-based if (1) on its face, it distinguishes between types of speech or speakers based on the viewpoint expressed; or (2) though neutral on its face, the regulation is motivated by the desire to suppress a particular viewpoint." *Moss,* 711 F.3d at 959

11

(citing *Berger v. City of Seattle,* 569 F.3d 1029, 1051 (9th Cir.2009) (en banc) and *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642–43 (1994), among others).

Plaintiffs allege that UCB campus regulations allow Sproul Plaza, the site of the protests, to be used without reservation for discussion or public expression which does not require or involve sound amplification equipment for the hours between 6:00 a.m. and 12:00 midnight. (SAC ¶ 9.) Viewpoint restrictions on public expression in Sproul Plaza would, then, presumptively be unconstitutional. *Playboy Entm't Group,* 529 U.S. at 817 (government regulation of political speech in a public forum based upon its content is presumptively unconstitutional). Plaintiffs allege that the UC Administrators established a policy to treat the protest encampment here differently than previous encampments on account of disagreement with the protestors' viewpoint and a motive to suppress their views. The protestors' message here was supportive of the Occupy movement and expressed opposition to Birgeneau and Breslauer's stated positions on University fee hikes and privatization. Plaintiffs allege that Chancellor Birgeneau, along with Breslauer, Holmes, Williams, Le Grande, and Celaya, were all in the same administrative positions seventeen months earlier when an on-campus encampment was permitting for several days in connection with a protest opposing Arizona's anti-immigrant SB 1070 law.[4] That encampment in May 2010 included tents, sleeping bags and tarps. However, upon hearing that a protest and encampment in solidarity with the Occupy movement was planned, Birgeneau and CMET immediately began planning a response that would include a strict no-encampment policy. And, even after learning that police had responded violently and people had been injured during the afternoon raid, Birgeneau told CMET members Breslauer, Le Grande, Holmes, and Williams that it was "critical that we do not back down on our no encampment policy." (SAC ¶ 100.) What followed was increased violence and alleged false arrests that night.

The Ninth Circuit's decision in *Moss* is informative. In *Moss*, protestors brought an action against U.S. Secret Service agents, police officers and others alleging First Amendment and other

---

[4] Moreover, UCB administration permitted establishment of a "tent city" on Sproul Plaza as part of protests in opposition to South African apartheid in 1985. (SAC ¶ 7.)

constitutional violations in connection with defendants' relocation of a demonstration critical of United States President George W Bush at a campaign stop during the 2004 presidential campaign. *Moss,* 711 F.3d 941. The anti-Bush protestors had pre-cleared their demonstration route with local police and were assembled about two blocks away from where President Bush was staying and having dinner. *Id.* at 954. A pro-Bush group was gathered in the same location, first across the street and, later, on the same side of the street as the anti-Bush group. *Id.* at 954-55. Secret Service agents told the local police that they had to move the anti-Bush group farther away. The police officers in riot gear squared off against the anti-Bush protestors, made amplified but largely unintelligible announcements ordering the protestors to move immediately, and without giving them time to respond or show that they understood the orders, began forcibly moving them by means of violent shoves, strikes with clubs, and pepper spray bullets. *Id.* at 955.

The Ninth Circuit rejected the defendants' motion to dismiss, finding that the plaintiffs stated a sufficient claim under the First Amendment. Plaintiffs sufficiently alleged differential treatment based on viewpoint because they were moved to a location where they had less opportunity than the pro-Bush demonstrators to communicate their message to the President. In addition, plaintiffs had alleged a sufficient basis for the claim based upon their allegations that the asserted motive of the police in moving them – to protect the President's safety – was a pretext given the different treatment of the two groups. *Moss,* 711 F.3d at 959-960.

Here, as in *Moss*, the allegations that other protests were treated differently with respect to permitting encampments are sufficient to allege viewpoint discrimination and pretext. The UC Administrators argue that the allegations of the SAC show that the reasons the police took the actions they did was to stop an encampment, not to suppress free speech. While this could provide a plausible, viewpoint-neutral rationale for directing the police not to allow an encampment as part of the protest, Plaintiffs have sufficiently alleged facts to suggest that this rationale is a pretext for viewpoint discrimination based upon the differential treatment of other protest encampments. Moreover, the Court does not permit the UC Administrators to introduce evidence outside the pleadings, by way of its requests for judicial notice, to contradict the allegations of the SAC.

The UC Administrators also argue that the circumstances of the encampment and protest here were very different from those during the May 2010 protest. They argue, offering a variety of documents for judicial notice, that many of the Occupy-associated encampments were in existence for weeks, and were characterized by dangerous and unsanitary conditions, while the May 2010 SB 1070 hunger strike protests were "ephemeral in nature." They offer a host of factual distinctions drawn from documents outside the pleadings. Again, the Court cannot and does not consider these factual issues in connection with the motion to dismiss.

### C.   QUALIFIED IMMUNITY

Finally, the UC Administrators argue that, even if the allegations here are sufficient to state constitutional violations, the claims should be dismissed nonetheless under the qualified immunity doctrine. Government officials are immune from civil suits for damages unless (a) plaintiffs allege facts that make out a violation of a constitutional right and (b) the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009); *Moss*, 711 F.3d at 957. Where a Section 1983 claim is brought against a supervising official – including any of the UC Administrators – *Iqbal* requires a court applying the second prong of the qualified immunity analysis to consider whether, in light of the facts that have been alleged, it would be clear to a reasonable supervisor that his or her own conduct was unlawful in the situation he or she confronted. *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012). "A lower standard would impose vicarious liability on supervisors based on their subordinates' clearly unlawful conduct." *Id.*

Here, Plaintiffs have pleaded sufficient facts to avoid a qualified immunity bar of their claims at the pleading stage. The Court has addressed the first prong of this analysis, sufficient allegations of a constitutional violation, above. Looking to the second prong of the analysis, the allegations here are sufficient to establish that the claims against all Defendants under the First Amendment, and against all Defendants except Wilton under the Fourth Amendment, are not barred by qualified immunity. The rights at issue, as alleged, were clearly established at the time.

On the First Amendment claim, years of Supreme Court precedent have established with

14

certainty that "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger,* 515 U.S. at 828; *see, e.g. Moss,* 711 F.3d at 963-64 (collecting cases). Restrictions that target one group for different treatment based upon viewpoint are plainly unlawful. *Id.*; *see also, Moss,* 711 F.3d at 959. As to the Fourth Amendment claims, it is likewise well established that government officials may not use excessive force, or make arrests without probable cause. *See Graham v. Conner,* 490 U.S. 386, 396; *Moss,* 711 F.3d at 966. Consequently, it would have been clear to a reasonable supervisor that refusing to stop the acts of subordinates, which they knew or reasonably should have known under the circumstances alleged would result in use of excessive force and false arrest, was a constitutional violation. *Baca*, 652 F.3d at 1207; *Moss*, 711 F.3d at 967.

## IV. CONCLUSION

Based upon the foregoing, the Court Orders as follows:

1. the motion to dismiss is **DENIED** as to the First Amendment claims against Defendants Robert J. Birgeneau, George Breslauer, Harry Le Grande, Linda Williams, John Wilton, Claire Holmes and Mitchell Celaya;

2. the motion to dismiss is **DENIED** as to the Fourth Amendment claims against Defendants Robert J. Birgeneau, George Breslauer, Harry Le Grande, Linda Williams, Claire Holmes and Mitchell Celaya;

3. the motion is **GRANTED WITHOUT LEAVE TO AMEND** as to the Fourth Amendment claims against Defendant John Wilton. Wilton is **DISMISSED** as a defendant in Counts Two and Three of the Second Amended Complaint.

4. Plaintiffs' Motion for Leave To Amend (Dkt. No. 183) is **GRANTED**. Plaintiffs are directed to file an "Amendment to the Second Amended Complaint," stating just the additional two paragraphs numbered 442a and 447a in their motion. Plaintiffs shall file this Amendment no later than January 28, 2014.

Defendants Robert J. Birgeneau, George Breslauer, Harry Le Grande, Linda Williams, John Wilton, Claire Holmes and Mitchell Celaya shall file their answer to the SAC no later than

15

February 11, 2014.

This Order terminates Docket No. 117.

**IT IS SO ORDERED**.

Date: January 17, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**