RONALD CRUZ, California Bar No. 267038
SHANTA DRIVER, Michigan Bar No. P65007*
MONICA SMITH, Michigan Bar No. P73439*
SCHEFF, WASHINGTON & DRIVER, P.C.
1985 Linden Street
Oakland, CA 94607
(510) 384-8859 Fax: 313-963-7587
ronald.cruz@ueaa.net
Attorneys for Plaintiffs
*Admitted *pro hac vice*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YVETTE FELARCA, et al. | **CASE NO.: 4:11-cv-05719-YGR-DMR** |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS FOR EXCESSIVE FORCE AND FALSE ARREST** |
| vs. | |
| ROBERT J. BIRGENEAU, et al., | |
| Defendants. | Date:      Hearing date not yet determined. |
| | Judge:     Hon. Yvonne Gonzalez Rogers |

1

# **TABLE OF CONTENTS**

2

**TABLE OF AUTHORITIES** ..........................................................................................................v

3

**NOTICE OF MOTION** ................................................................................................................1

4

**STATEMENT OF RELIEF SOUGHT** .......................................................................................1

5

**ISSUES TO BE DECIDED** .........................................................................................................1

6

**MEMORANDUM OF POINTS AND AUTHORITIES:**

**INTRODUCTION**........................................................................................................................2

7

**ARGUMENT**...............................................................................................................................3

8

    **I**       **The Plaintiffs are entitled to summary judgment against the**

9               **Administrator Defendants for excessive force and false arrests.** ...........................3

10           A.   Legal standards ....................................................................................................3

11           B.   The undisputed facts, viewed together, leave no doubt that the

                 Administrator Defendants' actions and omissions directly and

12                predictably led to the excessive force and false arrests committed on

                 November 9, 2011. ................................................................................................4

13

           C.   After the afternoon police action, the Administrator Defendants could be

14                certain that repeating their course of action would lead to further

                 excessive force and false arrests. .........................................................................8

15

    **II.**    **The Plaintiffs are entitled to summary judgment on their excessive force**

16               **claims against the Police Defendants.** . ....................................................................10

17            A.   Legal standard . ..................................................................................................10

18           B.   Facts favoring summary judgment for excessive force in favor of ALL

                the Plaintiffs....................................................................................................11

19                 1.   The principled, optimistic protesters that day posed no immediate

                     threat to the officers. ...........................................................................11

20

                2.   The Defendants' countervailing governmental interests did not

21                    justify their use of force. ......................................................................13

22                3.   The Defendants rejected their own tried-and-tested protocols

                    designed to prevent the use of police violence when ending

23                     protest actions deemed to violate University policies............................14

24

4. An overview of the police's actions on November 9, 2011 reveals that the police pursued two aims: preventing the development of an Occupy chapter at UCB and removing tents that might be erected on Sproul Plaza....................................15

a. Afternoon ....................................................................15

b. Evening ......................................................................17

C. Facts pertaining to certain individual Plaintiffs that favor summary judgment for excessive force, for those plaintiffs struck by officers who are Defendants. .......................................................................................21

1. Christopher Anderson's excessive force claims against ACSO Deputy Buschhueter, UCPD Officer Lachler, ACSO Deputy Obichere, and ACSO Sergeant Rodrigues .............................21

2. Joshua Anderson's excessive force claims against ACSO Deputy Buschhueter, ACSO Deputy Buckhout, and UCPD Sergeant Tucker ...................................................................22

3. Erick Uribe's excessive force claims against ACSO Deputy Buschhueter and UCPD Sergeant Tucker .............................23

4. Morgan Crawford's excessive force claims against UCPD Officer Lachler, ACSO Deputy Armijo, and ACSO Deputy Obichere.................................................................................24

5. Maximilian McDonald's excessive force claim against ACSO Deputy Armijo ...........................................................25

6. Anthony Morreale's excessive force claims against ACSO Deputy Armijo and ACSO Deputy Obichere..........................25

7. Taro Yamaguchi-Phillips' excessive force claim against UCPD Lieutenant DeCoulode...............................................26

8. Joseph Finton's excessive force claim against ACSO Deputy Garcia.....................................................................26

9. Colleen Young's excessive force claim against ACSO Deputy Garcia.....................................................................27

D.   Facts demonstrating that the Police Supervisor Defendants acted unreasonably and which favor summary judgment against them for excessive force. ...................................................................27

   1.   Lieutenant DeCoulode personally escalated the police violence, resulting directly in the excessive force against the vast majority of Plaintiffs. ...........................................................28

   2.   Chief Mitchell Celaya and Lieutenant Eric Tejada supervised the evening police action and are liable for the excessive force against Plaintiffs who received excessive force that evening. ...............33

**III.   The Plaintiff Arrestees are entitled to summary judgment on their false arrest claims against Chief Mitchell Celaya and Lieutenant Eric Tejada. . ........33**

A.   Legal standard ...................................................................34

B.   The lack of identified arresting officers does not defeat the Plaintiff Arrestees' false arrest claims. .............................................34

C.   Celaya and Tejada cannot meet their burden of showing probable cause for the arrests ...................................................................35

D.   Celaya's and Tejada's actions and omissions led directly and predictably to the false arrests of the Plaintiff Arrestees. ..................................35

E.   Circumstances of each Plaintiff Arrestee's arrest ...............................38

**CONCLUSION** ...................................................................40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

# INDEX OF AUTHORITIES

2

3

## Cases

4

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .................................................................3

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ...............................................................................28

*Dubner v. City and County of San Francisco,* 266 F.3d 959 (9th Cir. 2001) ......................... 34-35

*Graham v. Connor,* 490 U.S. 386 (1989) ........................................................................ *passim*

*Johnson v. Poway Unified School Dist.,* 658 F.3d 954 (9th Cir. 2011) ....................................4

*Moss v. United States Secret Service,* 711 F.3d 941 (9th Cir. 2013) .................................... *passim*

5

6

7

8

9

10

## Constitutional Provisions

11

U.S. Const. Amend. I ...............................................................................................40

U.S. Const. Amend. IV ..................................................................................1,10,34,40

12

13

14

15

## Statutes and Rules

16

Fed. R. Civ. P. 56 ................................................................................................. 1,3

42 U.S.C. § 1983 ............................................................................................. *passim*

Cal. Penal Code 726 ...........................................................................................36,38

17

18

19

20

21

22

23

24

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: NOTICE IS HEREBY GIVEN that the Plaintiffs move for summary judgment (1) for all Plaintiffs for excessive force and false arrest against defendants Robert Birgeneau, George Breslauer, Mitchell Celaya, Harry Le Grande, Linda Williams, and Claire Holmes; (2) for various Plaintiffs for excessive force against certain Police-Officer Defendants in accord with the included "Proposed Order"; (3) for various Plaintiffs against various Police-Supervisor Defendants in accord with the included "Proposed Order"; (4) and for Plaintiffs Francisco Alvarado-Rosas, Julie Klinger, Anthony Morreale, Sachinthya Wagaarachchi and Taro Yamaguchi-Phillips for false arrest against Defendants Celaya and Eric Tejada.

**STATEMENT OF RELIEF SOUGHT**

Plaintiffs seek relief under Fed. R. Civ. P. 56 for summary judgment on their Fourth Amendment claims asserted in their Third Amended Complaint.

**ISSUES TO BE DECIDED**

1.  Whether there is a genuine dispute over whether the massive use of police force Nov. 9, 2011 to prevent the Occupy movement from coming to UC-Berkeley was reasonable, and whether the UCB administrator defendants' actions would foreseeably lead to unreasonable force and arrests that day.

2.  Whether various police officers' beating of defenseless, peaceful protesters who "supported" tents was excessive.

3.  Whether the police supervisors who neglected to issue dispersal orders or restrain their officers and who issued orders aimed at preventing Occupy from coming to UCB, have supervisory liability for excessive force.

4.  Whether the defendants can show probable cause for the arrests of certain Plaintiffs.

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

### INTRODUCTION

3      The videos in this case are powerful evidence of police brutality. They show police

4  officers repeatedly striking student protestors who are standing with linked arms, to take down a

5  few tents on the University of California, Berkeley (UCB) campus. The videos are disturbing

6  because, in part, they are incomprehensible. Vivid depictions of police mercilessly beating or

7  brutalizing an integrated group of college students protesting at UCB is jarring and unexpected.

8      Videos do not guarantee justice. They do not win court cases by themselves. In police

9  brutality cases all across the nation, plaintiffs have failed to win their cases even when they have

10  indisputable evidence of police brutality. Movements are needed to win justice. Movements have

11  the ability to pull jurors out of their irrational fears and biases so that they can stand on the truth.

12      The collective action of the plaintiffs in this case has inspired young people across the

13  country. The videos in this case show protestors brave enough to stand up for their principles,

14  compassionate enough to weather baton strikes to protect each other. On November 9, 2011, the

15  twenty-one plaintiffs in this case stood together, fought for each other, and had each other's backs.

16  Strangers to each other when the day started; inextricably bound together when it ended.

17      The law approaches the plaintiffs' action as twenty-one *ad seriatim* individual suits. This

18  case, however, is stronger than the sum of its parts. The claims of each plaintiff strengthen the

19  claims of all the others. The plaintiffs fought as a movement on November 9[1]; they would not be

20  here if that was not the case.

21      §1983 is the one and only remaining civil rights statute of the Radical Reconstruction era.

22  It still affords the oppressed the opportunity to go up against the power of the state and win. Too

23  often, its reach in police brutality cases does not extend past the officer who struck the blows. The

24

---

[1] For the sake of brevity, "November 9" hereinafter refers to November 9, 2011.

1  people who make the policies are protected because it is so difficult to prove that the acts of the

2  police are based on the priorities and ideology of the people at the top.

3       The plaintiffs in this case know that everyone, from the individual officers to their

4  commanders to the university administrators to the Chancellor himself, are responsible for the

5  police brutality they suffered. The people who formulated the policing policies for that day were

6  the Chancellor and his Crisis Management Team (CMT). It was their fear of and opposition to the

7  growth of a movement on their campus—a movement capable of uniting with the Latina/o and

8  black communities of Oakland to wage winning struggles for public education and to stop the

9  privatization of UCB—that brought the police in riot gear.

10      The plaintiffs are confident that in this case the truth can prevail, that §1983 can serve the

11  new civil rights movement in its fight for equality as it once did the ex-slaves and the poor white

12  veterans of the Civil War striving to create a new America.

13

**ARGUMENT**

14

I.   **The Plaintiffs are entitled to summary judgment against the Administrator**
15       **Defendants for excessive force and false arrests.**

16      A brief review of the UCB administrators' policies, decisions, actions and inactions before

17  and on November 9 will show that no reasonable group of people possessing the authority to

18  make policing decisions and charged with the responsibility of protecting their students would

19  have acted in the reprehensible way that these administrators did.

20   A.  *Legal standards*

21      A court "shall grant summary judgment if the movant shows that there is no genuine

22  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

23  Civ. P. 56(a). Summary judgment is called for, if a reasonable jury could not return a verdict for

24  the nonmoving party based on the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

1   (1986). At the summary judgment stage, the evidence is to be viewed in the light most favorable

2   to the nonmoving party, in this instance the defendants. *Johnson v. Poway Unified School Dist.*,

3   658 F.3d 954, 960 (9th Cir. 2011).

4       Then-Chancellor Robert Birgeneau and the members of his Crisis Management Team

5   (CMT), George Breslauer, Harry Le Grande, Linda Williams, Claire Holmes, and Mitchell Celaya

6   ("the Administrator Defendants"), are liable for the unconstitutional acts of their subordinates if

7   one of the following is true:

8       (1) for *setting in motion* a series of acts by others, or *knowingly refusing to terminate* a
series of acts by others, which they knew or reasonably should have known would cause

9   others to inflict constitutional injury; (2) for culpable action or inaction in training,
supervision, or control of subordinates; (3) for *acquiescence in* the constitutional

10  deprivation by subordinates; or (4) for conduct that shows a "*reckless or callous
indifference* to the rights of others."

11  *Moss v. United States Secret Service*, 711 F.3d , 941, 967 (9th Cir. 2013) (emphasis added,

12  internal citations omitted).

13

14      B.  *The undisputed facts, viewed together, leave no doubt that the Administrator Defendants'
actions and omissions directly and predictably led to the excessive force and false arrests*

15  *committed on November 9, 2011.*

16      On November 3, 2011, Birgeneau met with members of his CMT, which had been

17  conferring for weeks in anticipation of the Occupy Wall Street movement's arrival onto the UCB

18  campus. At this meeting, the Administrator Defendants worked out a plan for how to deal with the

19  student protest action scheduled for November 9, 2011. The campus day of action was expected

20  to be the inaugural event of an Occupy Cal group. A strategy of offering no compromise, taking

21  tents down the minute they appeared,[2] and preparing for a large-scale police action was developed

22  at this meeting. Thus, the decision was made at this meeting to provoke a violent confrontation

23  with students to keep every vestige of the Occupy movement off of the UCB campus.

24  [2] As early as November 1, 2011, Birgeneau dictated to Breslauer that their policy was to "take all
tents down immediately." See EXHIBIT 1.

1    The only limitation placed on the use of force anticipated by the administration came from

2    Chancellor Birgeneau. The police were barred from using pepper spray and tear gas.[3] The tactics

3    under discussion pertained to the forcible engagement with a crowd rather than camping

4    paraphernalia and campers. Thus, it was clear that the administrators' goal was not merely

5    removing tents, but clearing a demonstration.[4] Apart from those two restrictions, the police were

6    free to use any kind of force needed to keep tents from being erected on university property, even

7    at remote places like People's Park.[5] No expression of the Occupy movement would be tolerated

8    at UCB. Anything and everything associated with the Occupy movement, from tents to

9    unregulated "signage" to mass gatherings of people from all walks of life to show the real unity of

10   "the 99%," were to be suppressed.[6]

11   The decision to suppress Occupy on the UCB campus and to shut down the movement

12   was nakedly political. Birgeneau has stated that he feared the campus being "taken over" by

13   "outside anarchists."[7] Breslauer feared "intransigents" coming to the campus.[8] Other CMT

14   members preferred to use the more generic label of "non-affiliates" as code to describe the people

15   and politics they were hostile to and wanted to keep barricaded off from the campus. Denying

16   people from Oakland access to the campus was an understood goal of the "No Occupy at UCB"

17   policy. Their concern about "non-affiliates" did not extend to the outside police agencies they

18   [3] See EXHIBIT 2, Excerpt from Robert Birgeneau's response to interrogatories, p. 9:14-19.
19   [4] In Oakland, police had not used pepper spray or tear gas to take down the tents. These were used many hours after the tents had been taken down. See EXHIBIT 3. "Police tear gas Occupy Oakland protesters" SFGate Oct. 25, 2011, p. 2 ¶1.
20   [5] On Nov. 1, 2011, Birgeneau rejected a proposal from Breslauer to allow Occupy Cal protesters
21   to put up tents at People's Park, which is four blocks from the campus. See EXHIBIT 1, p. 1, last paragraph.
22   [6] UCPD's "Operational Plan" for November 9, 2011 directed officers to "immediately address any tents, *tables*, structures, sleeping bags, camping gear, *electronic sound amplification*, food
23   distribution efforts, *banners / signs* larger than permitted, etc. Offenders must remove items from campus… and *all evidence will be seized.*" See EXHIBIT 4, "UCPD Operational Plan: Day of Action for Public Education, Rally & 'Tent City': 11/09/2011", p. 3 (emphasis added).
24   [7] See EXHIBIT 2, p. 9:9-14.
     [8] See EXHIBIT 5, George Breslauer email to a colleague.

1  invited to the campus on November 9. But from the standpoint of students, the greatest danger of

2  "non-affiliates" was introducing police from the East Bay region to the campus.

3  Everyone at the November 3, 2011 meeting agreed that a frequently invoked but rarely

4  enforced university "no camping" policy would serve as the legal basis for the administration's

5  actions. Birgeneau was clear that compromise with student supporters of Occupy was out of the

6  question, that the tents had to be removed the minute they appeared, and almost certainly that

7  would require swift, decisive, and unexpected police action. The policy of police brutality and

8  false arrests was aimed at demoralizing the student Occupy leaders and convincing them that the

9  price to pay to establish UCB Occupy was just too great. Swift action would be needed to preempt

10  "outside" reinforcements for the students arriving in time to sustain the student effort.

11  Even if the plans for November 9 required the CMT to violate their own policies for

12  student demonstrations that were aimed at avoiding violence—favoring negotiations to

13  precipitous police actions, using the element of time to deescalate confrontations, and minimizing

14  the use of force needed to end an occupation or encampment—then so be it. From the standpoint

15  of Birgeneau, Breslauer and the rest of the CMT, Occupy posed so great a challenge to their

16  authority and aims that law and policy considerations had to be subordinated to a show of

17  complete intransigence on the part of the administration to convey its unmitigated hostility to the

18  existence of the Occupy movement on their campus.

19  University of California Police Department (UCPD) Chief Mitchell Celaya and his

20  immediate subordinates, Lieutenant Tejada and Lieutenant DeCoulode, understood what they

21  were being asked to do and devised a plan to execute the policy on November 9. The day would

22  begin with police stationed at the entrances to the Berkeley campus to check ID's and confiscate

23  unauthorized signage, bullhorns, sleeping bags, cooking equipment and tents.[9] Police

24  _____
[9] See EXHIBIT 4, p. 3.

1   reinforcements from outside agencies would be present to help with those tasks and create a show

2   of force from early on.

3          The Administrator Defendants and police understood that the pretext of enforcing a "no

4   camping" policy actually required people to camp. But in order to repress the demonstration as a

5   whole, the vast majority of whose participants were not camping, the Administrator Defendants

6   came up with a pseudo-legal justification for their assertion that the crowd adjacent to the

7   unoccupied tents was committing a crime. In his deposition, Lieutenant Tejada, who gave the

8   dispersal orders to the Occupy supporters, claimed that the crowd was guilty of "supporting" the

9   "erecting of tents." Furthermore, those tents "are an element or instrument of camping, which is

10  unlawful."[10] This justification for crowd dispersal and arrests was based on the imaginary crime

11  of "supporting" an "element" of the "crime" of camping.

12         On November 9, the administration got the confrontation with Occupy Cal students they

13  had anticipated and were committed to having with their students. Birgeneau's directive of no

14  pepper spray or tear gas meant that the very first encounter between protestors was going to get

15  "real ugly" within minutes of its inception.[11] The police resorted to the use of batons on student

16  protestors literally within seconds of their first encounter, with peaceful student protestors doing

17  nothing more than chanting with their arms linked. In less than five minutes' time, the police were

18  not only repeatedly jabbing protestors with their batons but were escalating into beating protestors

19  lying on the ground trying to protect themselves from the vicious overhead baton swings raining

20  down on them.

21

22  [10] See EXHIBIT 6, Excerpt from deposition of Eric Tejada, p. 61:9-62:21.

23  [11] Via police radio, defendant Lieutenant DeCoulode ("#L9"), after his officers began jabbing
    protesters, told UCPD Captain Roderick ("#C3"): "We got a little heavy resistance here. It's
    either gonna have to be a fog or pepper spray to clear it out, or it's gonna be real ugly." See

24  EXHIBIT DISC 1: <u>UCPD000379 CONFIDENTIAL PD PTRL 1 11-9-2011 3-43-58 PM.wav</u>.
    (1:03-1:12).

1    Nearly five hours passed between this first police victimization and the police riot that

2    would occur that night, when the police not only intensified their beating of nonviolent protestors

3    but also instituted a new policy of mass false arrests.

4

5    *C.  After the afternoon police action, the Administrator Defendants could be certain that*
     *repeating their course of action would lead to further excessive force and false arrests.[12]*

6    Every one of the administrators in this case claims that they never saw the videos of the

7    afternoon police action posted on YouTube (that went viral) before they formulated the policies

8    that would be carried out later that night. However, their joint stance of preferring self-enforced

9    ignorance to knowledge did not keep them completely in the dark about what had already

10   occurred. All the Administrator Defendants received reports about what had happened from each

11   other, students, colleagues and irate alumni. They knew that batons were used, that five UCB

12   students and one UCB professor had been arrested, and that one student had gone to the

13   hospital.[13] No one argued for a change of policy. No one argued for moderation. No one placed

14   student safety above tent removal.

15   Chancellor Birgeneau, who was touring Asia, responded to the reports of what happened

16   in the afternoon by ordering the others to "not back down."[14] Breslauer admonished a professor

17   who complained about what had happened to the students, saying to instead focus on the mythical

18   "intransigents."[15] Le Grande, Celaya, Williams and Holmes made a token effort to negotiate with

19   the protestors, issuing information to the protestors about the evening dispersal order that turned

20   out to be false. Le Grande addressed protesters in the early evening, with Celaya, Williams and

21   Holmes present, and said that protesters would have a "ten minute warning" before any police

22

23   [12] All the plaintiffs who have false-arrest claims were arrested during the evening police action.
     [13] See EXHIBIT 7, Claire Holmes email.

24   [14] See EXHIBIT 8, Robert Birgeneau email.
     [15] See EXHIBIT 5, George Breslauer email.

1   action.[16] With the exception of Celaya, the Administrator Defendants then left campus knowing a

2   bloody encounter between police and protestors would occur after they left campus. Celaya then

3   supervised the entire evening police operation from a 2nd-floor balcony,[17] and ensured that the

4   ten-minute warning that the CMT had promised would not be followed and that the police

5   continued to use violence and make arrests even after the tents were being destroyed. That night,

6   Birgeneau responded to Chief Celaya's report of the day: "Congratulations on the great job you

7   are doing so far."[18]

8        No reasonable administrator would have preferred ignorance to knowledge about the

9   consequences of their own decisions. No reasonable administrator assigned to a "Crisis

10  Management Team" would have deserted their post knowing that they were creating an

11  impending disaster from the decisions they were making. No reasonable administrator would

12  ignore their own policies for minimizing police action and violence in favor of a policy that they

13  knew would result in injuries to their students. And no reasonable supervisor would cast a blind

14  eye to the action of their subordinates to avoid responsibility for their subordinates' actions.

15       While it is true that the Administrator Defendants in this case did not sign any arrest

16  warrants or wield any batons, their decisions and practices set off a chain of actions that were

17  "reasonably foreseeable" (*Moss*) to result in dozens of peaceful protestors getting brutalized by

18  the police and then illegally arrested. If any one of these administrators had acted, what happened

19  on the evening of November 9 from the brutality to the false arrests would have been prevented.

20  The inaction of the Administrator Defendants at that point conveyed that the brutality was

21  consistent with their intentions and their overall policy towards the demonstration.

22

23

24

---

[16] See EXHIBIT DISC 1: Video 051 (2:20-2:30)
[17] See EXHIBIT 9, Excerpt from deposition of Mitchell Celaya, p. 118:10-15.
[18] See EXHIBIT 10, Robert Birgeneau email response to Mitchell Celaya.

1       Finally, the Administrator Defendants, as members of the CMT, were charged precisely

2  with the responsibility of *managing crises,* such as precisely what occurred at the university on

3  that day. In fact, they knew their actions would create this crisis. Given their abandonment and

4  perversion of their duties, their conduct rose to the level of "reckless or callous indifference"

5  (*Moss*), thus making them liable for the excessive force and false arrests that were the foreseeable

6  consequence of their actions and inactions.

7

8  **II.   The Plaintiffs are entitled to summary judgment on their excessive force claims against the Police Defendants.**

9    *A.  Legal standard*

10      A §1983 Fourth Amendment excessive-force claim must prove that a police officer's force

11  was not objectively reasonable in light of the "totality of the circumstances." *Graham v. Connor*,

12  490 U.S. 386, 396 (1989). In doing so, the Court must weigh "the nature and quality of the

13  intrusion on the individual's Fourth Amendment interests against the countervailing governmental

14  interests at stake." *Id*. (internal quotations and citations omitted). It also must consider the

15  alternative courses of action available to the officers. *Moss*, 711 F.3d at 966.

16      *Graham* provides a non-exhaustive list of factors to help determine whether individual

17  police officers and/or their supervisors used a level of force that was warranted under the actual

18  situation in dispute.

19      Because all the plaintiffs' claims rely on the same set of facts and application of those

20  facts to the laws, we review the facts shared by all the plaintiffs' excessive force claims before

21  describing the unreasonable force each individual plaintiff suffered.

22

23

24

1

    *B. Facts favoring summary judgment for excessive force in favor of ALL the Plaintiffs*

2

       *1. The principled, optimistic protesters that day posed no immediate threat to the officers.*

3

       "[T]he most important single element" of the *Graham* framework is "whether the suspect

4

poses an *immediate threat* to the safety of the officers or others." *Id.* (emphasis added). Whether

5

the police and administrators should have perceived "danger" from the protesters on November 9,

6

is bound up with their assessment of who the protesters were. Chancellor Birgeneau, upon hearing

7

that students were brutalized with batons and arrested in the afternoon police action, shared this

8

evaluation of the protesters: "Obviously this group want exactly such a confrontation."[19] The

9

decisions the administration made in how to respond to the possibility of the Occupy movement

10

extending to UCB were based on a set of prejudices and fears that treated the supporters of the

11

Occupy movement as an undifferentiated mass of 'dangerous, law-breaking malcontents.'

12

       The twenty-one plaintiffs in this case are a diverse and compelling group of people.

13

Fourteen are men; seven are women. On November 9, 2011 they ranged in age from 20 to 41

14

years old. Seventeen of the plaintiffs were UC-Berkeley students: fourteen were undergraduates,

15

and three were graduate students. Two of the remaining plaintiffs, Benjamin Lynch and Louis

16

Helm, are scientists whose research is directly tied to UC-Berkeley. Benjamin Lynch is a space

17

plasma physicist and a research fellow at UCB, and Louis Helm directs a nonprofit organization

18

dedicated to studying artificial intelligence, which hires and works with UCB faculty and

19

students. The final two plaintiffs are Yvette Felarca, a Berkeley alumna, Berkeley public

20

schools middle school teacher, and well-known, highly respected, veteran political leader, and

21

Liana Mulholland, a University of Michigan graduate and a fulltime civil rights and immigrant

22

rights student organizer for the Coalition to Defend Affirmative Action, Integration, Immigrant

23

Rights, and Fight for Equality By Any Means Necessary (BAMN).

24

[19] See EXHIBIT 11, Robert Birgeneau email.

1       Five of the plaintiffs—Yvette Felarca, Sachinthya Wagaarachchi, Francisco Alvarado-

2  Rosas, Yania Escobar and Honest Chung—are all first-generation immigrants to the United

3  States. One plaintiff, Francisco Alvarado-Rosas, was an army veteran, and two others, Justin

4  Tombolesi and Colleen Mica Stumpf, grew up in families defined by fathers who were Vietnam

5  War veterans and suffered from untreated PTSD. Yania Escobar had gone from wanting to be a

6  police officer, to not wanting to be a police officer before November 9, to fearing police officers

7  after November 9. Yania Escobar, Jacquelyn Kingkade and Morgan Crawford were all people

8  who were struggling to break free from a tendency to get involved with abusive boyfriends. One

9  plaintiff, Joshua Anderson, was married and the father of three children. Another, Anthony

10  Morreale, had been convicted of involuntary manslaughter when he was fifteen and had spent

11  two years serving time in a juvenile facility. Some of the plaintiffs had parents who were

12  professionals and grew up in relatively affluent communities, while others grew up in less

13  privileged families and would not have been able to remain at UCB if the proposal before the

14  UC Regents on November 9, to raise tuition by 81 percent over five years, went forward.

15       All the plaintiffs supported the main demands of the November 9 protest action calling

16  for an end to the fee hikes and the privatization of the University, and for changes in the

17  University's admissions and financial aid policies to ensure that more poor, working-class,

18  middle-class and undocumented students and Latina/o, black, Native American and other

19  underrepresented minority students gained access to the University. They opposed privatizing

20  the University and the loss of academic freedom and free speech rights that were certain to

21  accompany it.

22       The plaintiffs all supported the Occupy movement, but just a few saw themselves as

23  committed builders or leaders of the movement. Only two of the plaintiffs actually planned to

24  camp out on Sproul. None of the protesters expected that the UCB administration would use

1   physical force to prevent students from camping out on Sproul Plaza, especially after the

2   widely-condemned use of force by Oakland Mayor Jean Quan against the Occupy movement.

3       *2.   The Defendants' countervailing government interests did not justify their use of force.*

4       The defendants' action did not meet any of the standards enumerated in *Graham* that

5   would justify their level of force on November 9.

6       The "governmental interests at stake" (*Graham*) were neither compelling nor legitimate.

7   On November 9, the police defendants used force to achieve two interrelated but separate goals:

8   (1) taking down the tents and (2) dispersing and demoralizing student activists to frustrate their

9   goal of bringing the Occupy movement onto the UCB campus. (The facts bear this out in the more

10  detailed narrative *infra*.) The police's contention that they used force against students only to gain

11  access to the tents and prevent camping is not supported by the evidence. In fact, the police's use

12  of violence on November 9 increased, in inverse proportion to their task of actually taking down

13  any tents. The actual students who erected the tents and clearly planned to stay in them were *not*

14  arrested or banned from Sproul, even though they were the most likely violators of the no-

15  camping policy. Only two campers were arrested on November 9: each was offered the

16  opportunity to leave the area and not be arrested, and both campers were only taken into custody

17  after they asked the police to do so.[20] The second, overarching aim of the police of shutting down

18  the nonviolent inaugural Occupy demonstration served no legitimate or lawful governmental

19  interest. The first aim of taking down the tents also served no legitimate governmental interest.

20  Neither aim justified the precipitous police action or the level of force used to achieve these aims.

21      The police did not have to make "split-second" decisions or act precipitously. *Graham*,

22  490 U.S. at 396. Every tactic was carefully planned and executed on a timetable determined by

23  the police themselves.

24

[20] See EXHIBIT 10, Robert Birgeneau email response to Mitchell Celaya, p. 3:7.

1    The police officers did not face an "immediate threat" from the protesters. *Id.* The police

2    defendants are not claiming that the demonstrators endangered any civilians or represented any

3    danger to the campus at large; damaged any property; or that the campers posed a flight risk. They

4    cannot make a plausible case that nonviolent students in tee shirts and flip flops posed a danger to

5    the safety of police officers, especially those clad in the armor of riot gear. The crime of

6    "camping" did not warrant the use of force employed by the police officers to prevent it from

7    happening. While the officers seemed to take offense at the demonstrators chanting things like

8    "You are the 99%" and "We're doing this for your children," this action of the protestors could

9    not be construed as aggressive or deserving of baton strikes, hair pulling, or false arrest.

10       3.   *The Defendants rejected their own tried-and-tested protocols designed to prevent the*
11            *use of police violence when ending protest actions deemed to violate University*
            *policies.*

12       Part of the *Graham* balancing test is whether "there were less harmful alternatives

13   available that a reasonable officer on the scene should have considered." *Moss*, 711 F.3d at 967.

14       If the defendants had merely wanted to remove the tents, they had a range of options they

15   could have employed that required no use of force. This included: negotiating directly with the

16   protestors to achieve a peaceful end to the protest action, rather than involving students who had

17   little to no relationship to the Occupy movement; delaying attempts to clear the tents until after

18   most protestors had voluntarily left the area[21]; deescalating the situation by allowing a cooling-off

19   period to take place before taking further action; and giving proper dispersal orders. These are

20   some but not all the available alternatives open to the police. Both Lieutenant DeCouolode and the

21   plaintiffs' expert witness, Richard Rosenthal, advocated for the use of pepper spray as a

22

23

24   [21] For example, in October 2010, UCB responded to an occupation by 500 people of UCB's Doe
     Library by allowing protesters to stay through the day because the library had not yet officially
     closed. See EXHIBIT 12, "Protesters Sit In at Doe Library," *Daily Californian,* Oct. 7, 2010.

1   preferable and less lethal method of force that could have been employed by the police to

2   accomplish their purported aims.[22]

3       4.  *An overview of the police's actions on November 9, 2011 reveals that the police pursued*
        *two aims: preventing the development of an Occupy chapter at UCB and removing tents*
4       *that might be erected on Sproul Plaza.*

5       *Afternoon*

6       After holding a noon rally followed by a march, the first Occupy Cal general assembly

7   was convened on Sproul Plaza. The General Assembly voted 476 to 1 on the north lawn on Sproul

8   Plaza in support of erecting tents. The crowd started to dissipate after the vote, and a handful of

9   protesters started setting up tents.

10      UCPD officers wearing baseball caps immediately moved in to confiscate the tents.

11  Although their action elicited shouts from the crowd, the officers were met with little to no

12  resistance. Over the next 40 minutes, a handful of protesters erected five tents.

13      Although the police had confiscated the tents at 3:00pm successfully with little to no

14  resistance, the police began donning riot gear soon afterward. From about 3:10 to about 3:35pm,

15  defendant Lieutenant Tejada gave barely audible dispersal orders to the crowd. The demonstrators

16  in the vicinity clearly believed that Tejada's dispersal orders were *pro forma* and gave him the

17  courtesy of utilizing the human microphone system called "mic check" so that he could be heard

18  by some of crowd. During these dispersal orders, the police in riot gear were not visible to the

19  crowd. None of the plaintiffs believed that the police would use force against them.

20      Several minutes after the last dispersal orders were given, two squads of police came from

21  the back of Sproul Hall and advanced on both the north and south sides of the demonstration.[23]

22  This was the first time the demonstrators saw officers in riot gear.

23

24  [22] See EXHIBIT DISC 1: UCPD000379 CONFIDENTIAL PD PTRL 1 11-9-2011 3-43-58
    PM.wav. (1:03-1:12); and EXHIBIT 13, Excerpt from deposition of Richard Rosenthal, p. 85:8-
    86:20.

1    Protesters were completely unprepared and shocked by the sudden and unprovoked acts of

2  police violence.[24,25,26] The immediate response of plaintiffs Erick Uribe, Christopher Anderson,

3  Joshua Anderson, Yvette Felarca and others to seeing defenseless protestors near them get hit was

4  to find a way to deflect all the baton thrusts and strikes to themselves in order to protect the

5  people close to them.

6    The welfare of others momentarily eclipsed the protesters' focus on defending the tents

7  and their right to peacefully protest. As the police violence spread to new areas and intensified,

8  protestors who had only had a passing interest in Occupy and/or had never before made a sacrifice

9  to defend their principles or rights in their lives, made the decision to keep their arms linked with

10  their fellow protestors and stay put. The escalation of violence by the police radicalized the

11  protestors and turned passive and contemplative supporters of the campus movement into self-

12  sacrificing movement leaders.

13    The police violence grew in inverse relation to the actual task of securing the tents: on the

14  north side, even after Lieutenant DeCoulode had sent some of his officers southward to meet

15  officers from the south who were already removing tents, he ordered two more advances against

16  the crowd.[27,28,29,30] DeCoulode's officers singled out to brutalize both known movement leaders

17  and particularly brave protestors who simply were engaged in nonviolent, non-aggressive protest

[23] See EXHIBIT 14 for a diagram of the afternoon police action.

[24] The videos that give the best overview of the afternoon police action are EXHIBIT DISC X: Videos 019 through 023. (They are in chronological order.)

[25] See EXHIBIT DISC 1: Video 001 (0:08-1:30), Video 105 (0:00-1:39).

[26] Plaintiffs Colleen Mica Stumpf, Jacquelyn Kingkade, Erick Uribe, Christopher Anderson, and Joshua Anderson were struck during this action. They are labeled in EXHIBIT 15.

[27] See EXHIBIT DISC 1: Video 022 (0:06-0:58), Video 106 (0:54-1:33).

[28] During the next advance against the crowd, plaintiffs Yvette Felarca, Liana Mulholland, Benjamin Lynch, Erick Uribe, Christopher Anderson, Morgan Crawford, Joshua Anderson, and Justin Tombolesi are struck by batons. These plaintiffs are labeled in EXHIBIT 16.

[29] See EXHIBIT DISC 1: Video 023 (0:18-1:25).

[30] During the last advance against the crowd, plaintiffs Joshua Anderson, Justin Tombolesi, Benjamin Lynch, and Erick Uribe are struck by batons. These plaintiffs are also labeled in EXHIBIT 16.

1   activity. In the south, officers, with the now-dismantled tents behind them, attacked and jabbed

2   protesters who were doing nothing more than chanting at the police with their arms linked.[31]

3       Apart from sadism or retaliation, the only plausible explanation for the policy of increased

4   police violence after the tents could be easily secured is that the police defendants wanted to

5   injure, scare, or intimidate students to leave Sproul Plaza, especially those who were perceived as

6   leaders of the new Occupy chapter at Berkeley. If the police's aim was only to stop more tents

7   from going up on the campus, they would have arrested the people who had put up the first set of

8   tents. But there was clearly a policy of taking no action against the people most likely to camp.[32]

9   *The Evening*

10      The police action was a full-out police riot from beginning to end.[33] Under the cover of

11  darkness and with fresh additional police added to their ranks, the ACSO and UCPD officers who

12  had been allowed and in some cases even ordered by Lieutenant DeCoulode and Lieutenant

13  Tejada to use excessive force, began their evening assault on the protestors where they had left off

14  in the day. Robert Hass, UCB professor and Pulitzer Prize-winning poet laureate, and his wife

15  Brenda Hillman came to the evening protest. They placed themselves in front of the protestors[34]

16  who were about to be attacked by the shock troop police under DeCoulode and Tejada. Here is

17  Professor Hass's harrowing account of what occurred:

18      Life, I found myself thinking as a line of Alameda County deputy sheriffs in Darth Vader
19      riot gear formed a cordon in front of me on a recent night on the campus of the University
        of California, Berkeley, is full of strange contingencies. The deputy sheriffs, all white
        men, except for one young woman, perhaps Filipino, who was trying to look severe but
20      looked terrified, had black truncheons in their gloved hands that reporters later called
        batons and that were known, in the movies of my childhood, as billy clubs.

21

---

22  [31] See EXHIBIT DISC 1: Video 012 (0:34-0:43, 3:03-3:35). Also see footage from an officer's
    chest camera, EXHIBIT DISC 1: Video 155 (5:40-6:25).

23  [32] See EXHIBIT 17, Excerpts from deposition of Eric Tejada, p. 57:1-58:14, p. 91:12-22.
    [33] The video that best conveys the nature of the police's evening action is EXHIBIT DISC 1:
24  Video 045.
    [34] See EXHIBIT DISC 1: Video 045 (0:20-0:46).

The first contingency that came to mind was the quick spread of the Occupy movement. The idea of occupying public space was so appealing that people in almost every large city in the country had begun to stake them out, including students at Berkeley, who, on that November night, occupied the public space in front of Sproul Hall, a gray granite Beaux-Arts edifice that houses the registrar's offices and, in the basement, the campus police department…

Earlier that day a colleague had written to say that the campus police had moved in to take down the Occupy tents and that students had been "beaten viciously." I didn't believe it. In broad daylight? And without provocation? So when we heard that the police had returned, my wife, Brenda Hillman, and I hurried to the campus. I wanted to see what was going to happen and how the police behaved, and how the students behaved. If there was trouble, we wanted to be there to do what we could to protect the students.

Once the cordon formed, the deputy sheriffs pointed their truncheons toward the crowd. It looked like the oldest of military maneuvers, a phalanx out of the Trojan War, but with billy clubs instead of spears. The students were wearing scarves for the first time that year, their cheeks rosy with the first bite of real cold after the long Californian Indian summer. The billy clubs were about the size of a boy's Little League baseball bat. My wife was speaking to the young deputies about the importance of nonviolence and explaining why they should be at home reading to their children, when one of the deputies reached out, shoved my wife in the chest and knocked her down…

My wife bounced nimbly to her feet. I tripped and almost fell over her trying to help her up, and at that moment the deputies in the cordon surged forward and, using their clubs as battering rams, began to hammer at the bodies of the line of students. It was stunning to see. They swung hard into their chests and bellies. Particularly shocking to me — it must be a generational reaction — was that they assaulted both the young men and the young women with the same indiscriminate force. If the students turned away, they pounded their ribs. If they turned further away to escape, they hit them on their spines.

None of the police officers invited us to disperse or gave any warning. We couldn't have dispersed if we'd wanted to because the crowd behind us was pushing forward to see what was going on. The descriptor for what I tried to do is "remonstrate." I screamed at the deputy who had knocked down my wife, "You just knocked down my wife, for Christ's sake!" A couple of students had pushed forward in the excitement and the deputies grabbed them, pulled them to the ground and cudgeled them, raising the clubs above their heads and swinging. The line surged. I got whacked hard in the ribs twice and once across the forearm.[35]

UCPD Chief Celaya and Lieutenant DeCoulode had conferred after the afternoon assault

on students and decided that they would order officers not simply to "move" the protesters out of

---

[35] From EXHIBIT 18, "Poet-Bashing Police", Robert Hass, *New York Times,* Nov. 20, 2011.

1   the way, but also order officers to make mass arrests.[36] The new policy of arrests did nothing to

2   get to the tents faster. Nor did it lessen the brutality of the police. If anything, it gave police

3   officers a way to target and victimize students who were nowhere near the tents. All of the

4   plaintiffs who were arrested were first hit by police batons.

5          UCPD Captain Roderick and UCPD command staff led a debriefing of officers that

6   summed up the police's attitudes and intentions after the afternoon protest. This excerpt from the

7   ACSO summary incident report summarizes Roderick's briefing:

8          According to UCPD, the protesters had now erected several tents on the lawn of Sproul
       Hall *in an act of defiance to express their opposition* to the law enforcement action taking
9      [sic] earlier in the day as well as in support of their primary objectives detailed above.
       UCPD *considered the protest to be an unlawful assembly* and requested we provide
10     assistance to *disperse the group and remove the tents*. UCPD also requested assistance
       with the *arrest of anyone who refused to leave the area* as instructed.[37]

11

12   The UCPD commander did *not* state that the reason to remove tents was any of the official

13   reasons given by UCB administrators to the campus community in November 2011 or within this

14   litigation: UCPD's reasons for attacking the protesters was not health-based sanitation concerns or

15   even running "anarchists" and "non-affiliates" off the campus because they knew that the vast

16   majority of demonstrators were their own students. Rather, it was that allowing the tents to stay

17   up would sanction an "act of defiance" that "expressed" opposition to police brutality and support

18   for the Occupy movement. The UCPD commanders cast a wide net for the police operation: the

19   entire protest was an unlawful assembly, and everyone in it would be subject to arrest. With these

20   directives, the police were primed to punish[38] and end[39] the demonstration.

21

22   [36] See EXHIBIT 19, Excerpt from Marc DeCoulode deposition, p. 68:11-23.
     [37] EXHIBIT 20, excerpt from ACSO Incident Report from Nov. 9, 2011.
23   [38] For extended, disturbing video of the police continuing to attack trapped protesters after
     reaching the tents, see UCPD's video included as EXHIBIT DISC 1: Video 109 (10:35-15:10).
24   [39] About forty minutes after taking down the tents and a thousand students had arrived to protest
     the police action, UCPD made one last attempt to suppress the demonstration: it attempted to

1    Earlier that evening, UCB Vice Chancellor Harry Le Grande had announced that

2    protesters would have a ten-minute warning before police would be used.[40] One purpose for this,

3    which the Administrator Defendants had negotiated with some student leaders, was to allow

4    undocumented immigrants time to leave to avoid arrest.[41]

5    But there would be no ten-minute warning, nor even a one-minute warning. And for

6    anyone who was standing more than a few feet from defendant Lieutenant Eric Tejada, there

7    would be no warning because he could not be heard at all.[42]

8    The manner in which the police acted was not designed to give anyone any warning,[43] nor

9    any opportunity to assess whether they wanted to stay and continue to take a beating. Immediately

10   after the police reached the crowd, they knocked people down with their batons and started

11   beating people on the ground, and many had no way to exit.[44] Some of those who tried to leave

12   faced more brutality leaving than they had faced while linked to other protestors.[45]

13   From the beginning, the officers' use of force at night was more aggressive. Nothing that

14   occurred during the evening was reasonable. It was not reasonable for the police line directly in

15   front of their commander to strike Robert Hass or his wife, and it was not reasonable for

16   Lieutenant DeCoulode and Lieutenant Tejada to do nothing to put an end to it. It was not

17   reasonable for police officers to indiscriminately hit defenseless students. While none of the

18

19   clear an entire acre of land in front of Sproul Hall by ordering the crowd to leave Sproul Hall's
     steps. See EXHIBIT DISC 1: Video 112 (at 0:13, 0:59, and 5:35).
     [40] See EXHIBIT DISC 1: Video 051 (2:20-2:30)
20   [41] See EXHIBIT 21: Excerpt from Harry Le Grande's response to interrogatories, p. 5:18-24.
     [42] Tejada's announcement is barely audible even on UCPD's video taken directly next to Tejada.
21   See EXHIBIT DISC 1: Video 109 (0:20-2:12). Also see EXHIBIT DISC 1: Video 028 (1:16-
     3:00).
22   [43] Each advance of the police line was not preceded by an audible order followed by a set time
     for people to decide whether to leave. Then police would attack without warning and without
23   consideration of people's actual ability to leave. For one of many examples, see EXHIBIT DISC
     1: Video 005 (4:42-5:10).
24   [44] See the situation facing protesters in EXHIBIT DISC 1: Video 045 (0:40-1:40).
     [45] See EXHIBIT 22, Excerpts from deposition of Anthony Morreale, p. 119:9-24.

1   police violence in the evening was reasonable, the violence that occurred after the tents had gone

2   down[46] only served the purpose of injuring and terrorizing students and movement supporters.

3          November 9 was a disgrace and remains a scandal. No one can or should defend what

4   happened on November 9.

5     C.  *Facts pertaining to certain individual Plaintiffs that favor summary judgment for*
        *excessive force, for those Plaintiffs struck by officers who are Defendants*

6          The facts pertaining to plaintiffs who were struck by officers who are defendants in this

7   case are presented plaintiff-by-plaintiff, in roughly chronological order.

8     1.  *Christopher Anderson's excessive force claims against ACSO Deputy Buschhueter, UCPD*

9        *Officer Lachler, ACSO Deputy Obichere, and ACSO Sergeant Rodrigues*

10         In the afternoon, plaintiff Christopher Anderson was on the northern side of the crowd,[47]

11   when defendant Lieutenant DeCoulode led out officers who started jabbing within seconds after

12   making contact with the crowd.[48,49] When the police started jabbing, Christopher Anderson stayed

13   in front because he figured that, if someone was going to get hit, it should be him, because he

14   thought that he could physically withstand the blows better than most. He also thought he might

15   be able to talk some sense into the officers and stop them from beating people. During this attack,

16   defendant ACSO Deputy Buschhueter jabbed him several times even though C. Anderson was not

17   threatening him or anyone.[50] While officers grabbed people by the hair who were trapped near the

18   hedge lining Sproul Hall, Buschhueter jabbed C. Anderson several more times.[51] Lieutenant

19

20   [46] See diagram produced by the UCB Police Review Board. EXHIBIT 23.
     [47] Christopher Anderson is labeled in EXHIBIT 15.

21   [48] See EXHIBIT DISC 2: Video 001 (0:08-1:30); Video 002 (0:18-1:11); Video 105 (0:00-1:39).
     [49] Anderson observed: "[The officers] weren't saying anything, and then I heard one officer right

22   before they—one of the officers said, 'Give them shit, take no shit.' And then they started
     hitting, which I thought was pretty odd." EXHIBIT 24, Excerpts from Christopher Anderson

23   deposition, p. 82:15-22.
     [50] See EXHIBIT DISC 2: Video 001 (1:06-1:27)

24   [51] See EXHIBIT DISC 2: Video 020 (0:41-0:45), Video 327 (0:16-0:20). Still from Video 327 of
     Buschhueter included as EXHIBIT 25.

1    DeCoulode then ordered a general attack by officers all along the line. During this, defendant

2    UCPD Officer Lachler (helmet number 38) jabbed Anderson in the back.[52]

3          Before returning in the evening, C. Anderson went home and prayed that the police

4    officers would understand what the protesters' goals were and not be violent.[53]

5          In the evening, C. Anderson rejoined the protest. He again was next to plaintiff Crawford.

6    Defendants ACSO Deputy Obichere[54] jabbed C. Anderson and Crawford many times,[55] including

7    a strike to Anderson's face horizontally with a baton that left him screaming and running out of

8    the demonstration.[56] After collecting himself, he resolved to return to the demonstration and point

9    out Obichere to others. While C. Anderson stood in front of the crowd, defendant ACSO Sergeant

10   Rodrigues charged from behind the line and jabbed C. Anderson repeatedly yelling "Move!

11   Move!"[57]

12

13        *2.   Joshua Anderson's excessive force claims against ACSO Deputy Buschhueter, ACSO Deputy Buckhout, and UCPD Sergeant Tucker*

14        Plaintiff Joshua Anderson was part of the protest during the afternoon, on the northern

15   side. As a squad of ACSO deputies walked through the path cleared behind the hedge toward the

16   tents, defendant Deputy Buschhueter followed the squad, but before reaching the bush he punched

17   plaintiff Erick Uribe in the torso with his fist and baton and pushed J. Anderson's face back with

18   _____

19   [52] See EXHIBIT 16, Photo of group including C. Anderson. See EXHIBIT DISC 2: Video 022 (0:12-0:18), Video 002 (2:34-2:50), Video 331 (0:05-0:17). Still from Video 331 of Lachler included as EXHIBIT 26.

20   [53] See EXHIBIT 24, Excerpts from Christopher Anderson deposition, p. 233:19-234:22.

     [54] Video 319 (0:53-0:55), Video 045 (2:11-2:35) [Morgan Crawford, who was next to C. Anderson, is visible], EXHIBIT DISC 2: Video 031 (1:27-1:31). Still from Video 031 of

21   Obichere in front of Anderson included as EXHIBIT 27.

22   [55] See EXHIBIT 28, Excerpt from Morgan Crawford deposition, p. 115:8-21.

23   [56] See EXHIBIT 29, still from Video 031 of Anderson. See EXHIBIT 30 a photo of Anderson from November 9, 2011 authenticated by Anderson in his deposition (EXHIBIT 24, Excerpts from Christopher Anderson deposition, p.122:2-23).

24   [57] EXHIBIT DISC 2: Video 005 (4:15-4:20).

the baton.[58] As Buschhueter proceeded down the path behind the bush, he struck Amanda

Armstrong in the chest with his baton (1:53). Plaintiff Joshua Anderson noticed Amanda

Armstrong trapped in the hedge. As he tried to help her get out to safety, Defendant ACSO

Deputy Buckhout grabbed J. Anderson from behind and put him in a headlock.[59] Buckhout

choked J. Anderson and pulled his hair (2:11). As J. Anderson tried to regain his balance he fell

backward (2:14). Buckhout held him down as two other officers jabbed J. Anderson on the

ground, aiming for his groin. Later, defendant Lieutenant DeCoulode ordered an attack all along

the line. During this attack, J. Anderson received an extended beating in which several officers

struck him more than 30 times. Buschhueter came back, joined in this beating, and went back to

the tents.[60] Later, Defendant Sergeant Tucker jointly commanded officers in the UCPD squad

with Sergeant Joey Williams. Tucker led the squad in pushing and jabbing the crowd backward.

As Joshua Anderson was not combative and was clearly disoriented, Tucker pushed and hit

Joshua Anderson in his upper chest and head area with his baton.[61] While Tucker inexplicably

jabbed protesters including plaintiff Erick Uribe, he knocked back a bearded protester, causing a

domino effect causing J. Anderson to tumble to the ground.[62]

### 3. Erick Uribe's excessive force claims against ACSO Deputy Buschhueter and UCPD Sergeant Tucker

Plaintiff Erick Uribe was at the northern side of the protest in the afternoon, at the front.[63]

When Lt. DeCoulode's officers almost immediately began jabbing protesters, Uribe stayed where

---

[58] The following timestamps are from EXHIBIT DISC 3: Video 020 (1:43-1:47). Still of Buschhueter is included as EXHIBIT 31.

[59] See EXHIBIT DISC 3: Video 020 (2:00-2:18). Still of Buckhout is included as EXHIBIT 32.

[60] See EXHIBIT DISC 3: Video 011 (0:00-0:40). Stills from Video 011 of Buschhueter included as EXHIBITS 33 and 34.

[61] EXHIBIT DISC 3: Video 023 (0:28-0:35). Still of Tucker is included as EXHIBIT 35.

[62] EXHIBIT DISC 3: Video 012 (2:37-2:49). Still of Tucker is included as EXHIBIT 36.

[63] See EXHIBIT 15, which labels Uribe.

1    he was "to assist people that were being assaulted in any way that [he] could."[64] As defendant

2    ACSO Deputy Buschhueter walked toward the path leading to the tents, he punched Uribe in the

3    torso with his fist and baton.[65] When defendant UCPD Sergeant Tucker ordered an assault to push

4    back the crowd, even after establishing his new skirmish line, he continued to jab Uribe.[66]

5         In the evening, Uribe was again at the front of protesters on the northern side. Defendant

6    ACSO Deputy Obichere jabbed him repeatedly with his baton, aiming for Uribe's groin and also

7    near his throat.[67]

8
9    4.   *Morgan Crawford's excessive force claims against UCPD Officer Lachler, ACSO Deputy Armijo, and ACSO Deputy Obichere*

10        Plaintiff Morgan Crawford was at the northern side of the protest in the afternoon, linking

11   arms with plaintiff Christopher Anderson.[68] In addition to supporting the goals of the protest, he

12   felt that he could serve as a mediator between police and students. When he could not hear the

13   dispersal order, he approached three officers for clarification and received none.[69] He did not

14   expect the police to be so unreasonable and so violent. During one of the general attacks along the

15   line ordered by Lieutenant DeCoulode, defendant UCPD Officer Lachler jabbed Crawford and

16   another male protester, aiming for their groins.[70]

17        In the evening, Crawford was again linked to C. Anderson on the northern side of the

18   protest. While Crawford and other protesters were trapped,[71] defendants ACSO Deputy Obichere

19
20   [64] See EXHIBIT 37, Excerpts from deposition of Erick Uribe, p. 67:12-19.
     [65] See EXHIBIT DISC 4: Video 020 (1:44-1:47).
21   [66] See EXHIBIT DISC 4: Video 012 (2:36-2:58), Video 149 (1:06-1:32), Video 023 (1:00-1:24).
     [67] See EXHIBIT 37, Excerpt from deposition of Erick Uribe, p. 68:12-19.
22   [68] See EXHIBIT 38, which labels Morgan Crawford and Officer Lachler.
     [69] See EXHIBIT 28, Excerpts from Morgan Crawford deposition, p. 69:17-72:4.
23   [70] See EXHIBIT DISC 5: Video 002 (2:34-2:50), Video 331 (0:05-0:17), Video 022 (0:12-0:18).
     [71] Crawford testified: "[T]here was this very, very, narrow aisle—I mean, if you can even call it
     that—between these students and the police officers, and every once in a while a photographer
24   would try and come into that to take photos, and they'd get thrown to the ground or, you know,
     assaulted with batons. And, you know, at that point, if I even did want to try to run away, I was

1   and ACSO Deputy Armijo[72] struck Crawford repeatedly,[73] including overhead strikes to the side

2   of Crawford's right shin that caused him the greatest pain he had felt in his life.[74]

3        5.  *Maximilian McDonald's excessive force claim against ACSO Deputy Armijo*

4        Plaintiff Maximilian McDonald[75] watched the protest from the nearby stairs. However, the

5   police ordered him to get off the stairs and walk in the direction of the protest. Here, at the

6   southern side of the protest, the police reached the tents in less than two minutes and established a

7   skirmish line between the protesters and the tents. The police had plenty of room to leave with the

8   tents.[76] However, the officers attacked the protesters. ACSO Deputy Armijo[77] jabbed plaintiff

9   Maximilian McDonald repeatedly.[78]

10

11        6.  *Anthony Morreale's excessive force claims against ACSO Deputy Armijo and ACSO*
         *Deputy Obichere*

12        Plaintiff Anthony Morreale[79] was in front of the northern side of the crowd during the

13  evening police action. Upon meeting the crowd, the officers immediately started jabbing people,

14  including people who were on the ground or trying to get away.[80] Defendants ACSO Deputy

15  Obichere and ACSO Deputy Armijo struck Morreale repeatedly, using jabs and overhead

16

17  pretty convinced that I would either be arrested or beaten over the head." See EXHIBIT 28,
    Excerpts from deposition of Morgan Crawford, p. 114:20-115:3.
    [72] Crawford identifies Armijo in his signed Declaration.

18  [73] See EXHIBIT DISC 5: Video 045 (2:11-2:35). Stills of Obichere and Armijo included as
    EXHIBIT 39 and 40, respectively. Crawford is seen briefly at 2:23, showing that Obichere and

19  Armijo are in front of him.
    [74] He was struck so hard, see EXHIBIT 28, p. 116 (1-16), that he had to be carried home by

20  friends and had to wear crutches for two weeks. See EXHIBIT 38, p. 125:13-18, 128:25.
    [75] Photo labeling McDonald is included as EXHIBIT 41.

21  [76] See EXHIBIT DISC 6: Video 012 (0:34-0:43).
    [77] McDonald identified Armijo in his deposition. See EXHIBIT 42, Excerpt from deposition of

22  Maximilian McDonald, p. 87:16-88:14. (He references a deposition exhibit that is included
    herein as EXHIBIT 41. EXHIBITS 41, 43, 44 together show that he identified Armijo.)

23  [78] See EXHIBIT DISC 6: Video 012 (3:03-3:35); a still labeling McDonald is included as
    EXHIBIT 45. Also see EXHIBIT 42, p. 87:16-88:14.

24  [79] See EXHIBIT 46, which labels Morreale.
    [80] See EXHIBIT 20, Excerpt from deposition of Anthony Morreale, p. 119:9-24.

1    strikes.[81] Obichere struck Morreale in the genitals.[82] Obichere then helped another officer pull

2    Morreale out of the crowd, after which he was thrown roughly to the ground and arrested.[83]

3         *7.  Taro Yamaguchi-Phillips' excessive force claim against UCPD Lieutenant DeCoulode*

4              Plaintiff Taro Yamaguchi-Phillips[84] was in the crowd of protesters that was trapped by

5    two lines of police approaching them from opposite sides.[85] Protesters could not leave.[86] The tents

6    were behind the police when defendant UCPD Lieutenant DeCoulode and other officers under his

7    command targeted, jabbed, and tried to arrest Amanda Armstrong, whom DeCoulode had

8    recognized as an activist, had spoken to before, and knew by name.[87] Yamaguchi-Phillips tried to

9    protect Armstrong from getting beaten and arrested because Armstrong "had done nothing."[88] In

10   retaliation, Lt. DeCoulode yanked Yamaguchi-Phillips' hair,[89] tried to arrest him, and struck him

11   several times with his baton using overhead strikes.[90]

12        *8.  Joseph Finton's excessive force claim against ACSO Deputy Garcia*

13             In the evening, plaintiff Joseph Finton was part of the crowd that was caught between two

14   opposing police lines.[91] Finton, who is only 5 feet 7 inches and weighs 110 pounds, was unable to

15

16   [81] See EXHIBIT DISC 7: Video 045 (2:39-2:45, 3:37-4:30) Obichere strikes Morreale at 2:41,
     stills of which are included as EXHIBITS 47 and 48. Obichere and Armijo strike protesters and
17   are in front of Morreale.at 3:37-4:30.
     [82] See EXHIBIT 22, Excerpt from deposition of Anthony Morreale, p. 280:8-281:19.
18   [83] See EXHIBIT DISC 7: Video 045 (4:20-4:30) and Video 109 (7:05-7:15).
     [84] See EXHIBIT 50, a photo that labels Yamaguchi-Phillips.
19   [85] See Police Review Board Report diagrams, "Evening on Sproul Plaza" (EXHIBIT 23).
     Yamaguchi-Phillips was in the crowd represented by the rightmost black circle in the third
20   diagram.
     [86] See EXHIBIT 51, Excerpt from Deposition of Taro Yamaguchi-Phillips, p. 91:18-92:9.
21   [87] See EXHIBIT 52, Excerpt from deposition of Marc DeCoulode, p. 117:25-119:14.
     [88] See EXHIBIT 51, Excerpt from deposition of Taro Yamaguchi-Phillips, p. 95:12-97:7.
22   [89] Some of this interaction is caught on video at EXHIBIT DISC 8: Video 109 (11:10-11:33);
     still of DeCoulode (his helmet number is L9), Yamaguchi-Phillips, and Armstrong included as
23   EXHIBIT 53. Also see EXHIBIT 54 to see better what Armstrong looks like.
     [90] See EXHIBIT 51, Excerpt from deposition of Taro Yamaguchi-Phillips, p. 92:10-93:19.
24   [91] See Police Review Board Report diagrams, "Evening on Sproul Plaza" (EXHIBIT 23). Finton
     was in the crowd represented by the rightmost black circle in the third diagram.

1  leave.[92] Defendant ACSO Deputy Garcia jabbed Finton in the stomach and chest ten to fifteen

2  times with his baton[93,94] and also jabbed a small woman to Finton's left,[95] as protesters pleaded

3  with the officers to stop because they had nowhere to go.[96]

4      *9.   Colleen Young's excessive force claim against ACSO Deputy Garcia*

5      Plaintiff Colleen Young was near Joseph Finton in the same group of protesters that was

6  surrounded and attacked by police.[97] She was unable to leave.[98] As Young was getting jabbed

7  repeatedly despite her telling officers she could not move,[99] defendant Deputy Garcia struck

8  Young and shoved her down the stairs of Sproul Hall.[100] She was trapped below a pile of people

9  and feared she would get trampled.[101]

10

11      *D.   Facts demonstrating that the Police Supervisor Defendants acted unreasonably and which*
         *favor summary judgment against them for excessive force.*

12      In §1983 actions, supervisors are liable for "setting in motion," "knowingly refusing to

13  terminate" a series of acts by others; for "action or inaction" in the "supervision… or control of

14

[92] See EXHIBIT 55, Excerpts from deposition of Joseph Finton, p. 93:17-94:11, 96:22-97(22).
15  [93] Ibid, p. 87:11-88:15, 91:20-92:22.
[94] See photos of Garcia in front of Finton: EXHIBITS 56 and 57.
16  [95] See EXHIBIT 55, p. 92:25-93:5. Finton said "the girl to the left [was] crying a lot." Ibid, p. 94:23-24.
17  [96] One video that captures much of this late police advance is EXHIBIT DISC 9: Video 036 (entirety). Garcia is the focus of the movie starting at 1:49. The video was taken by Finton's
18  friend Peter Reagan, who was next to Finton on Finton's right (EXHIBIT 62, Deposition of Joseph Finton, p. 98 (9-19). Plaintiffs have included a signed declaration from Reagan. Another
19  angle of this attack is provided by UCPD's video, EXHIBIT DISC 9: Video 109 (12:55-15:05). Finton and Reagan are in the group being assaulted by police from 12:55 forward, and Reagan is
20  struck at 14:17. A still from this video identifying Finton and Reagan is included as EXHIBIT 65.
21  [97] See EXHIBIT DISC 10: Video 036 (entirety). Young can be seen at 0:50-1:30 – she is the woman with blonde dreadlocks in a ponytail. See EXHIBIT 59, which labels Young.
22  [98] See EXHIBIT 60, Excerpts from deposition of Colleen Young, p. 127:25-129:4.
[99] See EXHIBIT DISC 10: Video 109 (12:55-15:05), a still from Video 109 identifying Young is
23  included as EXHIBIT 58. Young is in the group being assaulted by police from 12:55 forward. An officer strikes Young at 14:00-14:05.
24  [100] Ibid, p. 123:3-10.
[101] Ibid, p. 238:6-12.

1    subordinates," or for "acquiescence in the constitutional deprivation by subordinates. *Moss,* 711

2    F.3d at 967 (internal citations omitted). When testing for supervisory liability, the elements of

3    the underlying constitutional violation are similarly to be applied to their supervisors. *Ashcroft v.*

4    *Iqbal*, 556 U.S. 662, 676 (2009). The test for the underlying violation of excessive force is

5    whether the use of force in question was reasonable under the totality of the circumstances.

6    *Graham*, 490 U.S. at 395. Thus, the test for a supervisor is whether he or she acted as a

7    reasonable supervisor under the circumstances.

8

9        1.   *Lieutenant DeCoulode personally escalated the police violence, resulting directly in the excessive force against the vast majority of Plaintiffs.*

10          Defendant Lieutenant Marc DeCoulode was commander over the police approaching from

11   the north in the afternoon and the evening.[102]

12          DeCoulode failed to provide an adequate dispersal order to demonstrators in the afternoon

13   in the north. Lieutenant Tejada, who had given the protesters their last dispersal order a full

14   twenty minutes prior to DeCoulode's arrival, was not wearing riot gear. The demonstrators on the

15   north side received no warning or order in those twenty minutes prior to the arrival of DeCoulode

16   and his officers. In fact, DeCoulode did not even try to get a bullhorn to make a proper dispersal

17   order until *after* his subordinates were already using their batons to jab confused and surprised

18   protestors.[103] If Lieutenant DeCoulode had followed police protocol, visibly lined up his police in

19   riot gear, and then provided a proper dispersal order with warnings to the crowd that they would

20   be in danger of physical harm or arrest if they did not disperse in a set number of minutes,[104] some

21

22   [102] See EXHIBIT 61, Excerpts from deposition of Marc DeCoulode, p. 53:14-16 and p. 72:18-20.
     [103] After his officers began jabbing protesters during the afternoon, DeCoulode asked Lieutenant
     E. Tejada over police radio: "Can we have a bullhorn to give a command to move back?" See

23   EXHIBIT DISC 1: <u>UCPD000379 CONFIDENTIAL PD PTRL 1 11-9-2011 3-43-58 PM.wav</u>.
     (0:00-0:06).

24   [104] See standards for dispersal orders from the California Commission on Peace Officer
     Standards and Training (POST), included as EXHIBIT 62.

1   of them might have vacated the area and all of them would have been pre-warned of the physical

2   attack.

3        DeCoulode escalated the violence of his officers, failing to follow his own superior

4   officer's orders. UCPD Captain Roderick, DeCoulode's superior, had ordered DeCoulode over

5   the police radio: "Have the squads move in at a normal speed. We just wanna walk past the

6   protesters if they don't fight us. If they're gonna fight us, then push to establish a skirmish line

7   between the tents and the people standing."[105] But within seconds of their arrival on the north

8   side, without even trying to push protestors out of the way, DeCoulode's officers started jabbing

9   random protestors indiscriminately.[106] Plaintiffs Colleen Mica Stumpf and Jacquelyn Kingkade[107]

10  were hit by DeCoulode's officers during this first foray.[108,109] Stumpf was expecting and was

11  prepared to get arrested in traditional civil disobedience fashion and would have positioned

12  herself to do so,[110] but was instead beaten. Kingkade had no desire or intention of getting hit by a

13  police officer and would have vacated the area if she had been warned that the police were going

14  to strike people with their batons. Stumpf and Kingkade were never able to identify individual

15  officers who hit them, partly because the police attack occurred so unexpectedly and suddenly that

16  there is next to no video evidence of what happened to them.

17

18  ───────────────

19  [105] See EXHIBIT DISC 1: UCPD000376 CONFIDENTIAL PD PTRL 1 11-9-2011 3-40-34
    PM.wav. (0:00-0:30). (UCPD Captain Roderick #C3 speaks to Eric Tejada #L5 and Marc
    DeCoulode #L9.)

20  [106] See EXHIBIT DISC 1: Video 001 (0:08-1:30), Video 105 (0:00-1:39).
    [107] See EXHIBIT 15, which labels and identifies Stumpf and Kingkade.

21  [108] See EXHIBIT 63, Excerpt from deposition of Colleen Mica Stumpf, p. 68:13-70:13. Stumpf
    testified: "Q. So you didn't hear an officer say 'Move'? A. No. They were just hitting us. So

22  that's the part that was confusing, because I was like, okay, if you say, like, you're under arrest
    and you pull my body away from the crowd, that would have made sense to me, but instead, they

23  just marched up to us in a line and began beating us with clubs." Ibid, p. 69:12-18.
    [109] Stumpf is visibly being struck by officers being supervised by DeCoulode in EXHIBIT 64,

24  which is a photo still from EXHIBIT DISC 1: Video 105 (at 1:19).
    [110] See EXHIBIT 63, Excerpt from deposition of Colleen Mica Stumpf, p. 54:7 to p. 55:9.

1    Because Lieutenant DeCoulode allowed his subordinates to use their batons on the

2    protestors without any warning or attempt to use more reasonable and less violent methods to

3    make a pathway through the demonstrators first, he caused several demonstrators' primary focus

4    to shift to protecting the people around them who were getting jabbed and hit. The police response

5    to the disorientation of the protestors was to increase the number of protestors they hit for no

6    reason and to start using overhead swings. DeCoulode ordered the three sergeants directly under

7    his command, defendant UCPD Sergeant Tucker, ACSO Sergeant Rodrigues and UCPD Sergeant

8    Joey Williams, to lead assaults against protestors whose arms were linked.[111] He allowed those

9    sergeants to pull people's hair and throw them to the ground to arrest them for no reason, and to

10   use overhead swings[112] on protestors who presented no threat to the officers. One protestor,

11   Amanda Armstrong, whom DeCoulode had known by name as a student activist[113] and was

12   targeted repeatedly throughout the day, received a baton strike to the head[114] in front of

13   DeCoulode, and he took no action against the officer who did it. After DeCoulode had sent

14   officers through to access the tents (and therefore knew that they had access to them), Plaintiffs

15   Yvette Felarca and Liana Mulholland[115] received repeated baton jabs to their stomachs and torsos

16   by DeCoulode's sergeant Joey Williams,[116] and Plaintiff Benjamin Lynch was struck with an

17

18

---

[111] DeCoulode gave multiple orders and intently watched the police escalate their violence throughout. DeCoulode has helmet L9 in the following videos: EXHIBIT DISC 1: Video 105 (0:00-3:00), 022 (0:06-0:20), and 023 (0:00-1:27). EXHIBIT 72 is a still from Video 105 that labels DeCoulode. In Video 105 (0:00-3:00), DeCoulode is seen supervising the operation and giving orders to his sergeants. He can be heard at 2:45 telling defendant Sergeant Rodrigues to begin assaulting people close to the hedge lining Sproul Hall. In Video 022 and 023, he frequently gives orders to Sergeant Joey Williams (S14) and Sergeant Tucker (S13).

[112] For one example, see EXHIBIT 66 of DeCoulode overseeing an overhead strike by Sergeant Williams.

[113] See EXHIBIT 52, Excerpt from deposition of Marc DeCoulode, p. 117:25-119:14.

[114] See EXHIBIT 67, photo of strike to Armstrong's head.

[115] Felarca, Mulholland and Lynch are labeled in EXHIBIT 16.

[116] See EXHIBIT DISC 1: Video 022 (0:06-0:19)

1    overhead swing to his arm from Sgt. Williams and a baton strike to his head.[117] These three

2    plaintiffs do not have named officers who struck them as part of their excessive-force claims.

3         Within five minutes of their arrival on the north side of the demonstration, some of

4    DeCoulode's officers were captured in a chilling video[118] beating two of the plaintiffs in this case,

5    Joshua Anderson and Justin Tombolesi, after they had both fallen and were completely unable to

6    defend themselves. Tombolesi and Anderson were struck by four different officers using jabs and

7    overhead swings for forty seconds straight, incurring more than two dozen baton strikes. The

8    beat-down of Tombolesi and Anderson took place in DeCoulode's full view. At the time of the

9    beating, DeCoulode did nothing to restrain his officers, and he redeployed the same officers

10   involved during the evening police action against the demonstrators. He promoted one of the

11   officers involved in the beating, Joey Williams, to become sole team leader of the UCPD officers

12   under DeCoulode's command. Tombolesi does not have a named officer who struck him in his

13   excessive force claim.

14        During the evening police riot against the demonstrators, DeCoulode oversaw a clear

15   escalation even from the police's violence at the end of the afternoon attack. The elderly UCB

16   professor and Pulitzer Prize-winning poet laureate, Robert Hass, and his wife Barbara Hillman

17   were in plain view when they were among the first struck by batons and knocked down.[119] In a

18   repeat of his conduct in the afternoon, DeCoulode ordered his officers to immediately start

19   assaulting people without warning, which led directly to excessive force and the arrests of

20   plaintiffs Francisco Alvarado-Rosas and Sachinthya Wagaarachchi, who were caught in the

21   front next to the bushes at the beginning of the police attack. See *infra* at pages 38-39.

22

23

24   [117] See EXHIBIT DISC 1: Video 022 (0:18-0:20).
     [118] See EXHIBIT DISC 1: Video 011 (0:00-1:24).
     [119] See EXHIBIT DISC 1: Video 045 (0:20-0:46)

1    Additionally, DeCoulode led the evening police attack through example. His targeting and

2    beating of Amanda Armstrong and plaintiff Taro Yamaguchi Phillips were described above.

3    When Yamaguchi-Philips intervened to stop his targeting and beating of Armstrong, DeCoulode

4    attacked Yamaguchi-Phillips as well. See *supra* at page 26.

5    DeCoulode continued to advance the skirmish line farther and farther past the tents.[120],[121]

6    This sent the signal to his officers that they now had "bonus time" to beat whomever they pleased.

7    After the tents were already down, DeCoulode ordered another advance during which an officer

8    brutally jabbed plaintiff Honest Chung about ten times.[122] He was hurt so badly that he could not

9    walk and had to be carried out of the protest.[123] Louis Helm was pulled so hard that officers

10   ripped off his backpack,[124] and he was subjected to numerous overhead strikes by two or three

11   officers aiming for his head and ignoring his requests not to hit his head. The arm he used to

12   shield his head was heavily bruised.[125] Plaintiff Julie Klinger was holding up a sign that said

13   "Tents Are Free Speech." She was targeted and struck repeatedly by officers.[126],[127] Officers pulled

14   her out of the crowd, pushed her so hard that she was propelled over ten feet and fell to the

15   ground, and arrested her.[128] One officer jabbed plaintiff Yania Escobar, knocked her to the

16

[120] See diagram of evening police action at EXHIBIT 23.

17   [121] DeCoulode and Lieutenant Tejada personally joined in taking down tents and arresting people
     See EXHIBIT DISC 1: Video 003 (2:55-3:18), in which DeCoulode is dismantling a tent and

18   Tejada is handcuffing a protester. A still from this is included as EXHIBIT 68.

     [122] See EXHIBIT DISC 1: Video 005 (4:40-5:10). A still from Video 005 labeling Chung is
19   included as EXHIBIT 69.

     [123] See EXHIBIT DISC 1: Video 112 (8:35-8:50).

20   [124] See EXHIBIT DISC 1: Video 005 (3:00-3:06). A still of officers ripping off Helm's backpack
     is included as EXHIBIT 70. In the video, it is apparent that the officers already had spread their

21   skirmish line farther east, past the corner leading to the tents.

     [125] See EXHIBIT 71, Excerpts from deposition of Louis Helm, p. 183:4-14.

22   [126] One of the strikes against Klinger can be seen in EXHIBIT DISC 1: Video 005 (3:10-3:15). A
     still from Video 005 labeling Klinger is included as EXHIBIT 72.

23   [127] See EXHIBIT 73, Excerpt from deposition of Julie Klinger, p. 105:1-106:6.

     [128] She is seen being thrown violently in EXHIBIT DISC 1: Video 003 (3:27-3:38). The fact that
24   police already had destroyed the tents is even clearer in EXHIBIT DISC 1: Video 028 (4:35-
     4:50).

1   ground, and continued to jab her while she was on the ground.[129] For these and so many other

2   instances of police brutality that evening, DeCoulode had personally set the standard and made

3   clear to his subordinates that he would sanction and "acquiesce to" (*Moss*) any and every excess.

4   Chung, Helm, Klinger, and Escobar presently do not have the officers who struck them in their

5   excessive-force claims.

6          The whole arc of DeCoulode's performance was patently unreasonable (*Graham*) and

7   more than meets the test for supervisory liability in *Moss*.

8          2.  *Chief Mitchell Celaya and Lieutenant Eric Tejada supervised the evening police action*
               *and are liable for the excessive force against the Plaintiffs who received excessive force*
9              *that evening.*

10         Chief Celaya supervised and watched the entire evening police operation from a second-

11  floor balcony overlooking Sproul Plaza,[130] and Lt. Tejada followed the skirmish line during its

12  entire advance. Neither took any action against the gross instances of excessive force they saw.

13

14  **III.  The Plaintiff Arrestees are entitled to summary judgment on their false arrest claims**
        **against Chief Mitchell Celaya and Lieutenant Eric Tejada.**

15         In addition to summary judgment against the Administrator Defendants for false arrest, the

16  plaintiffs Francisco Alvarado-Rosas, Sachinthya Wagaarachchi, Anthony Morreale, Julie Klinger

17  and Taro Yamaguchi-Phillips ("the Plaintiff Arrestees") are entitled to summary judgment on

18  their claims of false arrest against defendants Chief Mitchell Celaya and Lieutenant Eric Tejada

19  for personally conducting the evening police action in a manner that directly and predictably led

20  to their false arrests.

21

22

23
_____
[129] See EXHIBIT 74, Excerpts from Deposition of Yania Escobar, p. 101:4-102:25, p. 181:8-
24  183:5.
[130] See EXHIBIT 9, Excerpt from deposition of Mitchell Celaya, p. 118:10-15.

1        *A.  Legal Standard*

2            A false arrest claim is cognizable under §1983 as a violation of the Fourth Amendment if

3    the arrest was "without probable cause or other justification." *Dubner v. City and County of San*

4    *Francisco,* 266 F.3d 959, 964-965 (9th Cir. 2001). Supervisors in §1983 actions may be liable for

5    the actions of their subordinates for "setting in motion," "knowingly refusing to terminate" a

6    series of acts by others; for "action or inaction" in the "supervision… or control of subordinates,"

7    or for "acquiescence in the constitutional deprivation by subordinates. *Moss,* 711 F.3d at 967

8    (internal citations omitted).

9

         *B.  The lack of identified arresting officers does not defeat the Plaintiff Arrestees' false arrest*
10          *claims.*

11           It is not strictly necessary for plaintiffs to be able to identify the arresting officer(s) in a

12   false-arrest action. The Ninth Circuit describes the order of proof for examining false arrest:

13           [The plaintiff] can make a prima facie case simply by showing that the arrest was
             conducted without a valid warrant. At that point, *the burden shifts to the defendant* to
14           provide some evidence that the arresting officers had probable cause for a warrantless
             arrest. The plaintiff still has the ultimate burden of proof, but the burden of production
15           falls on the defendant… If the defendant is unable or refuses to come forward with any
             evidence that the arresting officers had probable cause and the plaintiff's own testimony
16           does not establish it, the court should presume the arrest was unlawful.

17   *Dubner v. City and County of San Francisco,* 266 F.3d 959, 965 (9th Cir. 2001) (emphasis). This

18   burden shifting "forces the police department, which is in the better position to gather information

19   about the arrest," to present some evidence of probable cause. In *Dubner,* the plaintiff had

20   undertaken diligent efforts to confirm the identity of her arresting officers. The Court, by shifting

21   the burden of production to defendants, was attempting to "prevent this exact scenario where

22   police officers can hide behind a shield of anonymity and force plaintiffs to produce evidence that

23   they cannot possibly acquire." *Id.*

24

---

1    Like the plaintiff in *Dubner,* the Plaintiff Arrestees have undertaken a diligent effort to

2    obtain their arresting officers' identities, including through the extensive analysis of the more than

3    one hundred videos produced in this case. All the Plaintiff Arrestees were arrested during the

4    evening police action; however, the UC defendants produced records that list officers who

5    conducted arrests during the *afternoon* police action only.[131] Counsel for the Administrator

6    Defendants have stated that no records identify the arresting officers from the evening.[132,133]

7    *C.  Celaya and Tejada cannot meet their burden of showing probable cause for the arrests.*

8    The only evidence of probable cause that has been produced by the defendants is the

9    Plaintiff Arrestees' probable-cause declarations. But these are simply a set of identical,

10   conclusory statements signed by their booking officer, UCPD Officer Hallett, in violation of

11   UCPD's own policies, which require that the arresting officer complete an Offense Report.[134]

12   This is a patent failure to show probable cause under *Dubner,* which suffices to prove false arrest.

13

14   *D.  Chief Celaya's and Lt. Tejada's actions and omissions led directly and predictably to the false arrests of the Plaintiff Arrestees.*

15   UCPD Chief Celaya consulted with his commanders after the first assault on students and

16   decided that they would order officers to make mass arrests.[135] Making arrests in itself did not

17   further the defendants' goal of removing the tents. However, it did further the defendants' plan to

18   use force, terror and intimidation to abort the students' plan to bring the Occupy movement to

19   UCB. For career-oriented UCB students, being arrested and charged with a crime, sent to jail, and

20

21   [131] See UCPD use-of-force report included as EXHIBIT 75.
     [132] See email from Janine Scancarelli included as EXHIBIT 76.

22   [133] This violates UCPD's own booking procedures. All the Plaintiff Arrestees were detained for hours in the UCPD station after their arrests, and all were photographed. For this reason,

23   defendant DeCoulode was able to identify plaintiff Taro Yamaguchi-Phillips. Still, no record has been produced showing which UCPD officers arrested the Plaintiff Arrestees.

24   [134] See EXHIBIT 77, Excerpt from UCPD General Order B-1 ("Booking Procedures"), at #20.
     [135] See EXHIBIT 19, Excerpt from Marc DeCoulode deposition, p. 68:11-23.

1  brought up on university charges could make it much more difficult for them to get a job, further

2  their education or receive a fellowship, even if the charges were dropped.

3  California law sets requirements for dispersal orders, so as to give individuals in large

4  gatherings fair notice and opportunity to leave and avoid police force and arrest. California Penal

5  Code Section 726 reads: "[T]he sheriff of the county and his or her deputies, the officials

6  governing the town or city, or any of them, *must go among the persons assembled*, or as *near to*

7  *them as possible*, and command them, in the name of the people of the state, immediately to

8  disperse." Cal. Penal Code 726. Accordingly, the California Commission on Peace Officer

9  Standards (Commission on POST) sets these standards: "The dispersal order must be given in a

10  manner *reasonably believed to be heard and understood* by the intended audience… *Dispersal*

11  *orders should not be given until control forces are in position to support crowd movement*."[136]

12  Having officers in position gives fair warning about the immediate possibility of force and the

13  level of force that will be used. The model order takes further measures to ensure crowds have

14  fair warning:

15  "Other police action could include the use of force* which may inflict *significant pain or*
    *result in serious injury*. If you remain in the area just described, regardless of your

16  purpose, you will be in violation of Penal Code Section 409. The following *routes of*
    *dispersal are available (routes)*. You have (reasonable amount of time) *minutes* to

17  disperse."
    *\* Agencies may want to consider including the description of specific use-of-force*

18  *options (e.g., electronic control device, baton, chemical agents)*.[137]

19  This model order elaborates further on the type of force and risk of injury. It also provides an

20  explicit time limit (presumed to be a number of minutes) and provides available routes for people

21

22

23

24

---

[136] See EXHIBIT 62, California Commission on Peace Officer Standards and Training (POST),
"POST Guidelines: Crowd Management, Intervention, and Control," p. 33, ¶2 (emphasis added).
[137] Ibid, p. 33, ¶3 (emphasis in first paragraph added).

1    to leave. Further, the standards recommend "[p]ositioning law enforcement personnel to the rear

2    of a crowd to confirm and document hearing the transmission of the dispersal order."[138]

3          The dispersal orders issued by Lt. Tejada before the evening police action on November

4    9, and the police action Tejada ordered and supervised afterward, did not comply with these

5    requirements. Individuals standing a few feet from Tejada, let alone the Plaintiff Arrestees who

6    were within the crowd much farther away, could not hear the dispersal orders.[139] Chief Celaya

7    had put together and prepared UCPD's loud PA system earlier that evening so CMT member Le

8    Grande could address the crowd.[140] But apparently he and Tejada decided it was not necessary to

9    use this PA system before employing massive force against the northern side of the crowd that

10   evening.[141] Just one-and-a-half minutes after Tejada spoke through his bullhorn, dozens of

11   officers had come from around the corner and already had started jabbing people, knocking them

12   to the ground, and hitting people on the ground.[142]

13         Celaya and Tejada knew that the protesters were expecting a ten-minute warning before

14   police force would be used.[143] Chief Celaya did not implement the warning from his command

15   perch above the protest[144]; nor did he take action to stop the advance of his officers. Tejada

16   followed and supervised the skirmish line as it advanced into the protest, all the way up until

17   when it united with and formed a single skirmish line with officers from the south, even though

18   ───────────────────

[138] Ibid, p. 34.

19   [139] Tejada's announcement is barely audible even on UCPD's video taken directly next to
     Tejada. See EXHIBIT DISC 1: Video 109 (0:20-1:40). Also see EXHIBIT DISC 1: Video 028

20   (1:16-3:00).
     [140] See EXHIBIT 78, Excerpt from deposition of Mitchell Celaya, p. 101:7-24.

21   [141] UCPD used its PA system a half hour later, *after* it had used force against students. See
     EXHIBIT DISC 1: Video 112 (at 0:13, 0:59, and 5:35).

22   [142] See UCPD's video, EXHIBIT DISC 1: Video 109 (1:20-3:00)
     [143] Celaya testified that he was present when Le Grande spoke to the students that evening. See

23   EXHIBIT 78, Excerpt from deposition of Mitchell Celaya, p. 101:7-24. There, Le Grande
     announced that protesters would have a ten-minute warning (captured on video in EXHIBIT

24   DISC 1: Video 051 (2:20-2:30)).
     [144] See EXHIBIT 9, Excerpt from deposition of Mitchell Celaya, p. 118:10-15.

1   this was long after the tents had been removed. At times, he personally arrested individuals. A

2   total of thirty-four arrestees were led away past Tejada.

3       A reasonable police supervisor in Celaya's and Tejada's position would have made more

4   of an effort to ensure that their words would have been heard and that people could leave. This

5   would have included, at minimum, repeating the dispersal order *after* the police had approached

6   and made a visual demonstration, to give protesters an opportunity to reassess the risks of

7   staying. This would have included, at minimum, walking among the crowd in accordance with

8   Penal Code Section 726. And this would have included, at minimum, repeated "time outs" to

9   give protesters room and time to leave the protest.

10       In fact, the general impression one gets in reviewing these acts and omissions is that

11   Tejada read out the dispersal order as a half-hearted attempt to cover UCPD's legal liability. In

12   fact, their aim was the entirely political goal of carrying out many arrests.

13       E.  *Circumstances of each Plaintiff Arrestee's arrest*

14       Francisco Alvarado-Rosas had been to many protests before and believed that the

15   approaching police would do what he had seen at other demonstrations: start by communicating

16   with the crowd.[145] In fact, he was in the middle of assuring a woman next to him not to worry

17   when he was knocked to the ground.[146] He was only told to "move" after he was jabbed and

18   knocked face-down to the ground, where he was jabbed some more.[147] When he told them he

19   could not move because they were on top of him, they dragged him out and arrested him.[148]

20       Sachinthya Wagaarachchi was a few rows from the front when the police started to beat

21   the crowd. He also had little idea that the police would escalate their violence so quickly. He was

22   [145] See EXHIBIT 79, Excerpt from deposition of Francisco Alvarado-Rosas, p. 91:10-92:7.
    [146] See EXHIBIT 80, Excerpt from Francisco Alvarado-Rosas' answers to interrogatories, p.
23   8:15-20. An SFGate photo taken moments after he was knocked down is included as EXHIBIT
    81.
24   [147] See EXHIBIT 79, Excerpt from deposition of Francisco Alvarado-Rosas, p. 92:11-96:11.
    [148] See EXHIBIT 79, excerpt from deposition of Francisco Alvarado-Rosas, p. 92:13-17.

1  jabbed repeatedly in his stomach, and when he turned around he was jabbed several times more.

2  He was pulled out and arrested.[149]

3     Anthony Morreale was one of the many people who joined the protest when it was

4  apparent the police were arriving. As he arrived, the officers were already advancing and they

5  proceeded to beat people in the crowd. He saw people trying to leave also get brutalized.[150] He

6  was pulled out and arrested. More details of the excessive force used against him are given *supra*

7  at pages 25-26.

8     Julie Klinger was in the northern part of the protest that evening. The tents were already

9  down, but the police skirmish line continued to advance. Julie Klinger was jabbed repeatedly, and

10  officers pulled her out, pushed her so forcefully that they propelled her over ten feet and knocked

11  her to the ground, where she was arrested.[151]

12     Taro Yamaguchi-Phillips. As described *supra,* Yamaguchi-Phillips was in a crowd that

13  was surrounded by police, and people could not leave. He was arrested upon the orders of Lt.

14  Marc DeCoulode after Yamaguchi-Phillips protected another peaceful protester from brutality and

15  false arrest by DeCoulode. DeCoulode targeted Yamaguchi-Phillips and his officers arrested

16  him.[152]

17

18

19

20

21

---

22  [149] See EXHIBIT 82, Excerpt from deposition of Sachinthya Wagaarachchi, p. 77:9-78:),80:15-20.

23  [150] See EXHIBIT 22, Excerpt from Deposition of Anthony Morreale, p. 119:9-24.

24  [151] See EXHIBIT DISC 1: Video 003 (3:27-3:38). The police's position relative to the tents while arresting Klinger can clearly be seen in EXHIBIT DISC 1: Video 028 (4:35-4:50).
[152] See EXHIBIT 51, Excerpt from deposition of Taro Yamaguchi-Phillips, p. 91:18-92:9.

1

**CONCLUSION**

2      The police conduct in this case resulted in dozens of needless injuries, illegal arrests and

3  the violation of scores of demonstrators' Fourth and First Amendment rights. While the

4  individually-named police officers in this action were especially egregious in the unwarranted use

5  of force they meted out, this is not a case about a few rogue cops violating the otherwise just

6  policies of their supervisors.

7      The police supervisors on the ground could have and should have stopped rather than

8  encouraged the unlawful conduct of their subordinates.

9      The policy of the planned use of excessive force to shut down the official Occupy

10  demonstration and to remove the tents from Sproul was made and enforced by the two top

11  administrators of the university, Chancellor Birgeneau and Executive Vice Chancellor and

12  Provost Breslauer. Their decisions were political decisions. The §1983 Fourth Amendment claims

13  of excessive force and false arrest would not exist without the accompanying First Amendment

14  claims, and *vice versa*.

15      All of the named defendants had the opportunity and the authority to stop the debacle of

16  November 9. No one chose to act. And someone should have.

17      The plaintiffs have met the test for summary judgment against all the defendants. They

18  ask this Court enter their proposed order.

19

20  Date: May 4, 2015                    SCHEFF, WASHINGTON & DRIVER

21                                       By  /s/ Shanta Driver
                                         SHANTA DRIVER (Michigan P-65007)*
22                                       RONALD CRUZ (State Bar No. 267038)
                                         MONICA SMITH (Michigan P-73439)*
23                                       Attorneys for Plaintiffs
                                         * Admitted *pro hac vice*

24