UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YVETTE FELARCA, ET AL.,

            Plaintiffs,

    v.

ROBERT J. BIRGENEAU, ET AL.,

            Defendants.

Case No.  11-cv-05719-YGR

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**

Dkt. Nos. 387, 391, 432, 434, 435

Plaintiffs Yvette Felarca, *et al.*, bring this action under 42 U.S.C. § 1983, alleging claims for First Amendment and Fourth Amendment violations.  Presently pending before the Court are the following motions:

    1.  the Motion of Defendants Birgeneau, Breslauer, Le Grande, Williams, Holmes, and Celaya ("UC Administrators") for Summary Judgment on Claims of First Amendment Violations and Use of Excessive Force (Dkt. No. 387);

    2.  the Motion of Plaintiffs Francisco Alvarado-Rosas, Christopher Anderson, Joshua Anderson, Honest Chung, Morgan Crawford, Yania Escobar, Yvette Felarca, Joseph Finton, Louis Helm, Jacquelyn Kingkade, Julie Klinger, Benjamin Lynch, Maximilian McDonald, Anthony Morreale, Liana Mulholland, Colleen Mica Stumpf, Justin Tombolesi, Erick Uribe, Sachinthya Wagaarachchi, Taro Yamaguchi-Phillips, and Colleen Young ("Plaintiffs") for Summary Judgment Against Defendants for Excessive Force and False Arrest (Dkt. No. 391);

    3.  the Cross-Motion of: (a) Defendants Birgeneau, Breslauer, Le Grande, Williams, Holmes, Celaya, Tejada, DeCoulode and Tucker for Summary Judgment on the claims for false

arrest in violation of the Fourth Amendment by Plaintiffs Alvarado-Rosas, Klinger, Morreale, Wagaarachchi, and Yamaguchi-Phillips; (b) Defendants DeCoulode and Tucker on the direct excessive force claims against them by Plaintiffs Yamaguchi-Philips, Uribe, and J. Anderson (Dkt. No. 432); and (c) Defendants Tejada, DeCoulode, and Tucker on the supervisory excessive force claims against them by Felarca, Alvarado-Rosas, Chung, Escobar, Helm, Kingkade, Klinger, Lynch, McDonald, Mulholland, Stumpf, Tombolesi and Wagaarachchi (Dkt. No. 432);

4.  the Cross-Motion of Alameda County Sheriff's Office Defendants Armijo, Buckhout, Buschhueter, Garcia, Obichere, and Rodrigues, and Wilson ("ACSO Defendants") for Summary Judgment on the Fourth Amendment excessive force claims against them brought by Plaintiffs C. Anderson, J. Anderson, Uribe, Crawford, McDonald, Morreale, Finton, and Young  (Dkt. No. 434); and

5. the Cross-Motion of Defendant Samantha Lachler for Summary Judgment on the Claims of Plaintiffs C. Anderson and Crawford for Excessive Force in violation of the Fourth Amendment (Dkt. No. 435).

The Court having carefully considered the papers, pleadings, admissible evidence, and arguments of the parties **ORDERS** as follows:

1.   The motion for summary judgment of the UC Administrator Defendants and Defendant Tejada is **GRANTED** on the First Amendment claims.  Defendants are entitled to qualified immunity on the First Amendment claims because the constitutional right at issue was not clearly established.  The defendants were not objectively unreasonable in believing they could prohibit erection of tents on Sproul Plaza and could enforce their policies and procedures to prevent protestors from taking steps toward setting up an encampment.

The motion for summary judgment of the UC Administrator Defendants on supervisory liability for excessive force is **DENIED**.  Triable issues of fact exist as to whether the UC Administrator Defendants' actions and failure to act set in motion a series of acts by the officers which they knew or reasonably should have known would result in a constitutional injury to Plaintiffs, or whether their conduct showed a reckless or callous indifference to the rights of others.  *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (supervisors may be liable for their

own culpable action or inaction in the training, supervision, or control of subordinates, acquiescence, recklessness or callous indifference to the rights of others, and may be also be liable if there is a sufficient causal connection between their conduct and the constitutional violation, such as by setting in motion a series of acts by others, by knowingly refusing to terminate those acts when the supervisor knew or reasonably should have known that the acts would cause others to inflict a constitutional injury.)

The UC Administrator Defendants are not entitled to qualified immunity on the Fourth Amendment excessive force supervisory claims because triable issues of fact exist as to whether they had fair notice that use of batons on protestors in the absence of active resistance or threat to the officers would be unlawful, and that their failure to take any action to halt such use of force would create an unreasonable risk that police officers would violate the Fourth Amendment rights of the protestors, including Plaintiffs.

2.  Plaintiffs' motion for summary judgment on their claims for excessive force and false arrest (Dkt. No. 391) is **DENIED** as Withdrawn.  (*See* Plaintiffs' Opposition to Defendants' Cross-Motions for Summary Judgment, Dkt. No. 458 at 30:16-20.)

3.  As to the UC Administrators' cross-motion for summary judgment, the motion is:

(a) **GRANTED** as unopposed with respect to the false arrest claims;

(b)(*i*) **GRANTED** as unopposed on direct liability against Decoulode and (*ii*) **DENIED** as to direct liability against Tucker because triable issues of fact exist; and

(c)(*i*) **GRANTED** with respect to supervisory liability of Defendant Tejada since the only evidence offered by Plaintiffs is that he made an announcement to disperse and (*ii*) **DENIED** with respect to supervisory liability of Defendants DeCoulode and Tucker because triable issues of material fact exist as to their participation and direction of the alleged acts of excessive force by the officers under their direct command, which likewise preclude a determination of qualified immunity.

4.  On the ACSO Defendants' motion for summary judgment, the motion is **GRANTED IN PART AND DENIED IN PART** as follows:

United States District Court
Northern District of California

1    (a) **GRANTED** as to direct excessive force claims against Buschhueter and Rodrigues

2    because C. Anderson did not identify them in his discovery responses;

3    (b) **GRANTED** as unopposed on direct excessive force claim against Wilson;

4    (c) **DENIED** as to direct excessive force claims against Obichere by C. Anderson, J.

5    Anderson, Crawford, and Morreale; direct excessive force claim against Armijo by Crawford and

6    Morreale; and direct excessive force claims against Garcia by Finton and Young;

7    (d) **DENIED** as to supervisory claims against Rodrigues, since the motion itself did not give

8    proper notice that Defendants were moving on the supervisory claim against Rodrigues; and

9    (e) **DENIED** as Moot as to claims that were not pleaded in the Third Amended Complaint

10    ("TAC") or pleaded against defendants that have been dismissed (*i.e.*, direct claim by McDonald

11    against Armijo; direct claim by Uribe against Buschheuter and Obichere; direct claim by J.

12    Anderson against Buschheuter and Chavez);[1]

13    5.  On Defendant Lachler's motion for summary judgment, the motion is **DENIED** because

14    triable issues of fact exist as the reasonableness of the use of force she used against Plaintiffs C.

15    Anderson and M. Crawford, and whether a reasonable officer would have understood the nature of

16    the force used in such circumstances was a violation of the Fourth Amendment.

**I.    EVIDENTIARY ISSUES**

18    Defendants filed a set of joint procedural and evidentiary objections to Plaintiffs'

19    opposition to their cross-motions for summary judgment.  (Dkt. No. 499.)  The procedural

20    objections regarding the submission of an overlength brief without leave have been addressed

21    separately.  (*See* Dkt. No. 496.)  The Court denies Defendants' request to decline consideration of

22    the opposition or to strike pages from it.  The Court likewise denies Defendants' request that the

23    Court decline to consider evidence submitted with Plaintiffs' Opposition on the grounds that all

24    Plaintiffs' evidence was required to be submitted with their affirmative motion for summary

25    judgment, which would be contrary to F.R.C.P. 56.

26

27    _____

        [1] Plaintiffs' briefing and evidence suggest that they are seeking to take claims not pleaded
28    in the operative complaint to trial.  However, Plaintiffs are limited to the claims pleaded in the
        TAC that have not otherwise been dismissed by this Court's prior orders.

United States District Court
Northern District of California

Defendants object to the declaration of Neal Lyons, whose testimony is offered as "a video analyst with [Plaintiffs' legal counsel] United for Equality and Affirmative Legal [*sic*] Defense Fund." (Lyons Decl. Dkt. No. 452-27.)  Lyons declares that he organized and analyzed the video evidence in the case "for the purpose of investigating supervisor commands in determining the course of events during the two major encounters between protesters and police at the UC-Berkeley campus on November 9, 2011." (*Id.* at ¶ 2.)  He reviewed pictures and videos provided to him by Plaintiffs' counsel, Ronald Cruz, and prepared a report and visual exhibits entitled "Overview of the Coordinated Tactical Activity by the Police: A Reconstruction Based on the Video Evidence from November 9, 2011." (*Id.* at ¶ 5 and Exh. C.)  He also declares that he prepared the DVDs and accompanying indices, which purport to provide an overview of police tactics, as well as specific evidence for individual defendant officers, and specific evidence for each Plaintiff.  He further declares that he identified various police officers based upon a combination of UCPD helmet numbers provided by Cruz and reading officers' names on their uniforms in the videos. (*Id.* at ¶ 7.)  Defendants' objections to the Lyons declaration, as well as his exhibits, overview, and indices, and any associated opinions or conclusions therein, are well taken.  Lyons does not establish qualifications as an expert, nor was he disclosed as one.  He does not provide a proper foundation for the evidence included in the exhibits.  His Exhibit C "Overview" of the videos is argumentative.  The Court therefore finds that the Lyons Declaration and Exhibits are excluded to the extent they include opinion, conclusion, or argument.

Defendants also object to the Cruz Declaration, which purports to authenticate numerous videos as "personally gathered" by Cruz from various internet locations, or as obtained from other individuals who took the videos.  Defendants object that Cruz has not established a foundation of personal knowledge as to any of the videos and cannot authenticate them.  Those objections are all sustained.

Defendants also put forward objections to the declarations of individual Plaintiffs offered in opposition.  Defendants' objections are largely made on grounds that the testimony is irrelevant, conclusory, or makes accusations about defendants against whom certain plaintiffs have no existing claim in the operative complaint.  The Court finds that these objections are without merit.

1   The only objection to the individual declarations that the Court sustains is an objection that the

2   declaration of Julie Klinger was not signed under penalty of perjury.  For this reason, the Court

3   does not consider it.

4        Defendants' also filed a set of objections to Plaintiffs' affirmative motion for summary

5   judgment and the evidence submitted in connection therewith.  Defendants' objections are

6   sustained as to:

7        1.     The declaration of Peter Reagan and the videos he purports to authenticate, since

8   Plaintiffs represented that they would not rely on Reagan and Defendants were not given an

9   opportunity to depose him in reliance on that representation.

10       2.     Exhibits to the Declaration of Ronald Cruz (Dkt. No. 391), Nos. 3, 12, 14, 15, 16,

11  18, 20, 23, 25, 26, 27, 29, 31, 32, 33, 34, 35, 36, 38, 39, 40, 43, 44, 45, 46, 47, 48, 50, 53, 54, 56,

12  57, 58, 59, 64, 65, 66, 67, 68, 69, 70, 72, 81, on grounds of lack of foundation and authentication.

## II.   BACKGROUND

14       This section 1983 lawsuit arises from incidents that took place on November 9, 2011, near

15  Sproul Hall on the campus of the University of California at Berkeley ("UCB" or "the

16  University").  On that day, a planned demonstration occurred on the UCB campus, described by

17  organizers as an "Occupy" event in solidarity with the Occupy Wall Street movement and similar

18  actions in Oakland and elsewhere across the country.

19       **A.**     **CMET and Operational Plan**

20       UCB administrators, including Chancellor Birgeneau, learned of the planned event weeks

21  in advance and assembled a Crisis Management Executive Team ("CMET"), which developed a

22  plan for how to deal with the event.  (Plaintiffs' Exh. B., Dkt. No. 390-3, Operational Plan.)

23  Birgeneau was emphatic that the University would "[u]nder no conditions…allow an

24  enca[m]pment."  (*Id.*)

25       The Operational Plan included direction to "immediately address any tents, tables,

26  structures, sleeping bags, [and] camping gear," and indicated that "[o]ffenders must remove items

27  from campus, or receive citations" indicating that students would receive student conduct

28  citations, and non-affiliates and employees would be cited under section 148 of the Penal Code,

United States District Court
Northern District of California

obstructing police officers in the discharge of their duties, and the Campus Code of Regulations (CCRs).  (Operational Plan at 3.)  The Operational Plan also discussed camping on UC Property, stating that students were prohibited from camping by the Student Code of Conduct, and non-affiliates were prohibited from camping by the CCRs.  (Operational Plan at 4.)  The Operational Plan stated that:

> Officers will strongly suggest affiliates leave campus taking camping gear with them…Officer[s] will not permit Non-Affiliates to bring any type of camping equipment, or items reasonably associated with the setting up of a 'household' or campsite onto the campus…Non-Affiliates who refuse to comply or attempt to set up camp after being given an opportunity to leave, will be arrested, cited and 626d[2] if appropriate.

(*Id.* at 4-5.)  The Operational Plan did not specify any particular use of force that would be permitted in enforcing the removal of tents that were erected, or even suggest that force should be used to effectuate removal of tents.  With respect to use of force for crowd control, the Operational Plan provided only that "OC[3] spray should not be used indiscriminately, or as [a] first effort to disperse a crowd…and CS[4] Gas should only be considered under extreme situations and as a last resort."  (*Id.* at 4.)  Importantly, the Operational Plan did specify that:

> field units will attempt to stabilize, secure and de-escalate conflict at the scene by establishing a reasonable perimeter…Operations supervisors and team leaders will relay observations and information to the command post.  Command staff will consult with appropriate University administrators to develop an appropriate and coordinated response plan….
> Officers may take independent police action to defend themselves or others from an imminent threat of serious injury or death.  Otherwise, officers assigned to skirmish lines or other crowd control duties are not authorized to take actions independent from their teams or inconsistent with the instructions provided by the chain of command.

(*Id.* at 4.)

---

[2] The term "626d" apparently refers to California Penal Code section 626.2, which sets forth criminal penalties for unauthorized entry upon a campus or university facility.

[3] Oleoresin Capsicum, commonly known as pepper spray.  (*See* Celaya Decl. Dkt. No. 387-14, Exh. A at 9.)

[4] "CS gas" refers to 2-chlorobenzalmalononitrile, more commonly known as tear gas.

United States District Court
Northern District of California

**B.     Events of the Afternoon of November 9**

According to UCB Police Chief Celaya's account of the day, early in the morning of November 9, "teach-outs" began on Upper Sproul Plaza.  (Plaintiffs' Exh. I, Dkt. No. 390-11, "Celaya Report.")  Around noon, a loud but peaceful rally of approximately 3000 people occurred.  By 2:00 p.m., the group numbers had decreased and there was some discussion of setting up an encampment.  (*Id*.)  At 2:30, with a group of about 300-400 protestors present, smaller groups began setting up tents on the grassy area near the steps to Sproul Hall.  (*Id*.)  UCPD Captain Roderick approached the individuals setting up the tents and told them to take them down, but the individuals refused.  (Celaya Report.)  The crowd on the west side of Sproul Hall was declared an unlawful assembly by Captain Roderick, who directed Defendant Officer Tejada to read a dispersal order to the crowd.  (Plaintiffs' Exh. D, Dkt. No. 390-6, Depo. of Tejada at 61-62.)  The basis for declaring the assembly unlawful, according to Tejada, was that the crowd was violating rules against camping on UC property and that, even if they were not actually setting up tents, they were "supporting that action by the actions and words."  (*Id.* at 62.)  Officers did not attempt to identify who was putting up the tents or whether they were students or non-affiliates.  (Plaintiffs' Exh. J, Dkt. No. 390-12, Tejada Depo. at 57-58, 91.)

Roderick and other officers began removing the tents, surrounded by protestors.  (Celaya Report.)  After those were removed, other protestors began setting up more tents in the same area, as other protestors attempted to block the police officers and form a "human chain" to prevent them from reaching the tents.  (Celaya Report.)  The officers used their batons and their hands to break through the protestors and remove additional tents that had been set up.  Six protestors were arrested for interfering with and physically obstructing the officers.  (Celaya Report.)

During the afternoon of November 9, Birgeneau, Breslauer, Holmes, and Williams were in contact by email regarding the afternoon protest, the arrests, and the "injury and hospitalization" of one student.  (Plaintiffs' Exh. E, Dkt. No. 390-7.)  Breslauer reported that "300-400 people tried to set up an encampment on the lawn…[a]fter assessing the situation, the police moved in to remove the tents…[and p]rotestors locked arms to prevent police from getting to the tents.  Police

1   used batons to gain access to the tents." (Plaintiffs' Exh. F., Dkt. No. 390-8.) Birgeneau

2   responded that:

3       [t]his is really unfortunate…Obviously this group want exactly such a
4       confrontation…It is critical that we do not back down on our no enca[m]pment
        policy. Otherwise, we will end up in Quan land.

5   (*Id.*)[5]

6       Around 4:00 p.m., members of the UCB CMET, including Celaya, Williams, and

7   LeGrande, met with student leadership to attempt to negotiate regarding the ongoing protest. UC

8   Administrators told the protestors that they would allow use of Sproul Plaza "24x7 for a week" but

9   they could not have tents, sleeping bags, and cooking materials, and they could not sleep there.

10  (Celaya Report.) According to Celaya, this offer had been discussed with and approved by

11  Breslauer. (*Id.*) Protestors rejected the offer, and Celaya began plans to remove additional tents

12  that had been set up on the grassy area between 9:30 and 10:00 p.m. At the time, protestors

13  numbered around 150-200. (*Id.*)

14      In the early evening, faculty member Peter Glazer contacted Breslauer by email, asking if

15  he would consider leaving the tents for the night and negotiating the next day because he was

16  "concerned about violent confrontations tonight." (Plaintiffs' Exh. C, Dkt. No. 390-5.) Breslauer

17  responded that allowing tents to remain was "not among our plans" and that tents had to be

18  removed immediately to avoid "empowering the intransigents and leading to an influx of outsiders

19  to defend the camp." (*Id.*) Celaya and Roderick determined that people who interfered with

20  removal of the tents in the evening would be arrested, not just moved out of the way. (Exh. K,

21  Decoulode Depo. at 68.)

22      By 7:00 p.m. that evening, all of the CMET members (LeGrande, Williams, and Holmes)

23  who had been on campus during the events of the day, other than Police Chief Celaya, had left for

24  the day. (Williams Depo., p. 103-104:3; Holmes Depo. at 182-85; Le Grande Depo. at 172.)

25

26

27      [5] Birgeneau's "Quan land" warning apparently referred to Jean Quan, Oakland Mayor at
    the time of a prolonged Occupy encampment in downtown Oakland that lasted several weeks and
28  involved violent confrontations between police and protestors.

United States District Court
Northern District of California

Holmes, as she was driving away from the campus, messaged Chancellor Birgeneau, stating, in part:

> "One student was hurt and is in the hospital.  They are live streaming the situation so it will all be on you tube [*sic*]. [¶] Our statement from Monday is widely circulated and quoted.  I d[on']t see a need for another message.  I a[m] hoping that this d[o]es not get worse tonight."

(Plaintiffs' Exh. E., email from Holmes to Birgeneau, Dkt. No. 390-7.)

### C. Events of the Evening of November 9

Around 9:20 p.m., officers approached the gathered crowd of protestors and announced that they must move and that they were in violation of rules against camping on campus.  (Celaya Report.)  Many protestors did not move and attempted to block the police officers from reaching the tents.  (*Id*.)  Officers used batons and hands to make the protestors move in order to get to the tents.  (*Id*.)  Thirty protestors were arrested for obstructing officers, resisting arrest, and unlawful assembly in regards to camping.  (*Id*.)  Two protestors were inside a tent and were "given the offer to leave but refused and wished to be arrested."  (*Id*. at 3.)

Defendant Celaya observed the action from the balcony of the nearby student union building and was in contact with Captain Roderick.  (Plaintiffs' Exh. G, Dkt. No. 390-9, Depo. of Celaya.)  Celaya's report of the events indicated that some officers sustained "bumps and bruises" and that he had received reports of injuries to protestors, including two that had gone to "urgent care" – one in the afternoon and one as a result of the last attempt to remove tents that night.  (Celaya Report at 4.)

### III. APPLICABLE LAW

Summary judgment is proper if the pleadings and evidence in the record "show that there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  Any party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case.  *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis on

United States District Court
Northern District of California

10

which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. *Id.* at 248–49. Defendants, on their motions, have the burden of producing evidence negating an essential element of each claim on which they seek judgment or showing that Plaintiffs cannot produce evidence sufficient to satisfy their burden of proof at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000). If defendants meet that burden, plaintiff may defeat summary judgment by showing, through admissible evidence, that a material factual dispute exists. *California v.Campbell.* 138 F.3d 772, 780 (9th Cir.1998). When deciding a summary judgment motion, courts must view the evidence in the light most favorable to the nonmoving parties and draw all justifiable inferences in their favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir.2011). Summary judgment is rarely appropriate when credibility is at issue. *SEC v. M & A West. Inc.,* 538 F.3d 1043, 1055 (9th Cir. 2008). "Where the facts are disputed, their resolution and determinations of credibility 'are manifestly the province of a jury.'" *Wall v. County of Orange,* 364 F.3d 1107, 1110–11 (9th Cir.2004) (quoting *Santos v. Gates,* 287 F.3d 846, 852 (9th Cir.2002)).

## IV.   ANALYSIS

In general, to prevail on a section 1983 claim against individual officials, a plaintiff must show that the official, acting under color of state law, caused the deprivation of a federal right. *Hafer v. Melo,* 502 U.S. 21, 25 (1991). A public official sued in an individual capacity may assert a defense based on qualified immunity, which precludes liability for damages insofar as the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Dittman v. California,* 191 F.3d 1020, 1027 (9th Cir.1999). To determine whether qualified immunity applies, a court looks to whether: "(1) the officer's conduct violated a constitutional right; and (2) the right which was violated was clearly established at the time of the violation." *Espinosa v. City and County of San Francisco,* 598 F.3d 528, 532 (9th Cir.2010) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). "A right is clearly established if a reasonable officer would know that his conduct was unlawful in the situation he

United States District Court
Northern District of California

United States District Court
Northern District of California

1    confronted." *Espinosa,* 598 F.3d at 532.  "If a genuine issue of material fact exists that prevents a

2    determination of qualified immunity at summary judgment, the case must proceed to trial."

3    *Serrano v. Francis,* 345 F.3d 1071, 1077 (9th Cir.2003).

4         Plaintiffs assert violations of the following rights under the United States Constitution: (a)

5    the First Amendment, (b) the Fourth Amendment based upon excessive use of force, and (c) the

6    Fourth Amendment based upon false arrest.  The Court addresses each in turn.

7         **A.       First Amendment Claims**

8         The UC Administrator Defendants move for summary judgment on Plaintiffs' claims for

9    violation of their First Amendment rights to free speech and expression.  Under the First

10   Amendment to the United States Constitution, a citizen has the right to be free from governmental

11   action taken to retaliate against the citizen's exercise of First Amendment free expression rights or

12   to deter the citizen from exercising those rights in the future.  *Sloman v. Tadlock,* 21 F.3d 1462,

13   1469–70 (9th Cir.1994).  "Expression, whether oral or written or symbolized by conduct, is

14   subject to reasonable time, place, or manner restrictions."  *Clark v. Community for Creative Non-*

15   *Violence,* 468 U.S. 288, 293 (1984).  Such restrictions "are valid provided that they are justified

16   without reference to the content of the regulated speech, that they are narrowly tailored to serve a

17   significant governmental interest, and that they leave open ample alternative channels for

18   communication of the information."  *Id.*  "[A] message may be delivered by conduct that is

19   intended to be communicative and that, in context, would reasonably be understood by the viewer

20   to be communicative… [and such expression] may be forbidden or regulated if the conduct itself

21   may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial

22   governmental interest, and if the interest is unrelated to the suppression of free speech."  *Id.* at

23   294.[6]  Further, "[a]lthough officials may constitutionally impose time, place, and manner

24

25   _____

26        [6] Plaintiffs insist that the legal analysis should be one focused on prior restraint, the
     hallmark of which is a restriction "predicated upon surmise or conjecture that untoward
     consequences may result," prior to any actual harm or legal violation, citing *New York Times Co.*
27   *v. United States*, 403 U.S. 713, 725-26 (1971).  However, *Clark*'s discussion of regulation of
     communicative conduct, and the Constitutional limitations thereon, is the most analogous to the
28   situation here and the analysis on which the Court relies.

United States District Court
Northern District of California

restrictions on political expression…they may not 'discriminate in the regulation of expression on the basis of content of that expression.'"  *Sloman,* 21 F.3d at 1469-70.

### 1. Prohibition on "Camping"

The University's basis for its Operational Plan in advance of the protest, and the resulting orders that protestors to disperse and police officers to take action against protestors' disobedience, was enforcement of its no-camping policies, as stated in its rules and regulations.[7] The no-camping policies themselves were content-neutral, *i.e.* they applied regardless of the message of the protestors.  Plaintiffs contend, however, that they were enforced differentially, based on whether the University tolerated the message of the protest or not.

Plaintiffs contend that tents and camping were a symbol of the national Occupy movement and that the UC Administrator Defendants banned the symbol outright, claiming that they were doing so based upon the idea of preventing harms that were merely speculative.  Plaintiffs argue that the administrators "did not want tents, the main symbol of the Occupy movement, to be visible on the campus."  (Oppo. at 7:8.)  The restrictions the University imposed treated the planned encampment differently from other encampments, based on a motive to suppress the message of the protest.  Plaintiffs also argue that tents are distinct from camping, and preventing tents on Sproul Plaza was a pretext for preventing students from joining or expressing solidarity with the Occupy movement.  The University determined to shut the protest down before any of the anticipated harms materialized.  Indeed, the University itself submits evidence that it offered to allow protesters to *gather and remain* on Sproul Plaza 24 hours a day, seven days a week, so long

---

[7] The UC Administrator Defendants argue that University regulations specifically prohibited the *erection* of tents as well as camping, citing ES 1-3.  The rules themselves do not make such a distinction, at least for students.  The UCB rules and regulations state that no person on University property may "camp or lodge on University property other than in authorized facilities."  (Celaya Exh. B, Regulations Implementing University Policies, Section 321(n).)  The Code of Student Conduct includes "camping or lodging on University property other than in authorized facilities" as grounds for discipline.  (Celaya Exh. C at 102.15-16, 24.)  And UC system-wide regulations concerning "non-affiliates" (*i.e.*, those who are not UC students, faculty, or staff) state that non-affiliates may not "camp, occupy camp facilities, use camp paraphernalia" or "bring any tent on University property or occupy any such tent or housing structure."  (Celaya Exh. D, section 100005.)  Thus, it is only non-affiliates that are specifically forbidden from bringing tents onto the campus.

1    as they did not set up tents, sleeping bags, or cooking equipment.  (Le Grande Decl. ¶ 10; Holmes

2    Decl. ¶ 24; Birgeneau Decl. ¶ 21.)

3         Plaintiffs offer evidence they say shows the University treated this protest differently than

4    other protests where there were encampments/occupations on University property.  The primary

5    example they offer is a 2010 protest and hunger strike on campus, where protesters were allowed

6    to have tarps/canopies and to stay round-the-clock for several days.  (Birgeneau Decl., Dkt. 387-3,

7    ¶ 9-10.)[8]  In addition, they offer evidence of: (1) the November 2009 occupation of Wheeler Hall

8    by a group of students for several days; (2) the three-day occupation of Wheeler Hall in December

9    2009; (3) the 2006-08 tree-sit,[9] which lasted for some 18 months; and (4) the "occupation" of Doe

10   Library on October 7, 2010, by some 500 people, which protestors ended voluntarily within one

11   day.

12        In the lead time to the November 9 protest, the CMET members, including Breslauer,

13   expressed concerns that an Occupy-style protest on the campus would lead to a long-term

14   encampment.  (Breslauer Decl., Dkt. No. 387-3, ¶ 12.)  Specifically, with respect to health and

15   safety, Breslauer was concerned that enclosed tents would make it difficult for police to monitor

16   what was happening inside the tents.  (*Id.*)  Both Breslauer and LeGrande indicate hearing reports

17   that, in the Occupy Oakland encampment, assaults had occurred in tents.  (LeGrande Decl., Dkt.

18   No. 387-7, ¶ 4.)  There were also concerns expressed that camping on campus could create

19   sanitation issues and could interfere with normal campus activities.  (*Id.*)  On the other hand,

20   _____

21        [8] According to Breslauer, this hunger strike attracted only a small number of people who
     were not permitted to sleep (or "camp") overnight, and were only allowed the canopy to protect

22   them from the sun.  (Breslauer Decl., Dkt. No. 387-4, ¶¶ 8, 9.)  A small group of protestors
     remained overnight and officers were directed to monitor the protesters to ensure that they were

23   not sleeping, and to wake them up if they appeared to be sleeping.  (Celaya Decl., Dkt. No. 387-
     13, ¶20.)  Plaintiffs submit evidence from a person involved in the hunger strike indicating that

24   there were people sleeping, eating, maintaining food and supplies during the protest and that no
     police officers required them to leave.  (Lynch Decl., Exh. 12, Dkt. No. 414-17.)

25

26        [9] Both Birgeneau and Breslauer were UCB administrators at the time of a long-term, small-
     scale protest referred to as the "tree-sit," in which rotating groups of individuals stayed

27   continuously (including sleeping and eating) in the branches of trees surrounding an area slated for
     construction of a new sports training facility on campus.  (Birgeneau Decl., Dkt. No. 387-3, ¶ 6;

28   Breslauer Decl., Dkt. No. 387-3, ¶ 7.)

United States District Court
Northern District of California

Defendants themselves submit evidence that that they were prepared to permit the protestors to remain in Sproul Plaza "24/7" so long as they did not erect tents or camp, suggesting that the focus was not on "occupation" of the space on a continuous basis, but tents and "camping" *only*.

### 2. *Impact of First Amendment and Analysis*

The circuits have not settled on whether there is First Amendment protection for camping or sleeping overnight in a public space as a form of expressive conduct. *See Clark,* 468 U.S. at 292-93 (assuming without deciding, in accord with D.C. Circuit's opinion, that overnight sleeping is expressive conduct protected to some extent by First Amendment, but upholding narrowly tailored restrictions on that conduct); *Dukore v. D.C.*, 970 F. Supp. 2d 23, 30 (D.D.C. 2013) *aff'd,* 799 F.3d 1137 (D.C. Cir. 2015) (dismissing First Amendment violation on qualified immunity grounds where it was not unreasonable for defendants to believe that tent was being used both as a sign of protest and an abode in violation of local ordinance); *Occupy Nashville v. Haslam*, 769 F.3d 434, 445-46 (6th Cir. 2014) (no clear First Amendment right to sleep outdoors or set up encampment); *Occupy Minneapolis v. Cnty. of Hennepin*, 866 F. Supp. 2d 1062, 1069, 1071 (D. Minn. 2011) (accepting premise that overnight sleeping in tent cities is expressive conduct, permitting First Amendment challenge to ban on tents and sleeping).

Regardless of whether the University's restrictions on camping, and enforcement of those restrictions here, was a violation of the First Amendment, the individual defendants here will not be liable if they are subject to qualified immunity for their actions. Individual public officials are entitled to qualified immunity if they did not violate any "statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014).

In the instance case, Plaintiffs do not challenge whether the University's rules and regulations banning camping or overnight sleeping are constitutional *per se*, but whether: (1) those rules were applied in a manner that discriminated against the message of the particular protest; and (2) those rules may be applied to ban tents as symbols in the absence of camping. On the differential treatment question, the evidence indicates that the nature of the planned encampment was so different from the other protest examples offered by Plaintiffs as to be incomparable. The

United States District Court
Northern District of California

University took steps to enforce its policies against overnight sleeping before an encampment began to take hold.  The University offered content-neutral reasons for not allowing an encampment to remain on University property, including disruption, sanitation, safety and other attendant issues for the administration to monitor and regulate.  To the extent that the University reacted differently to this protest than to the hunger strike, building occupations, and tree-sits, the difference in scale and intention of the occupation here precludes an inference that any differential treatment was due to the message of these protestors.  The other evidence Plaintiffs offer does not support a reasonable inference that the planned enforcement of the camping ban was based upon the content of the protestors' message, rather than on neutral health, safety, and administrative concerns.

The question of whether the tents alone—solely as a symbol of solidarity, without overnight sleeping and encampment—should have been permitted is not the factual situation presented.  Organizers of the protest made clear their intention as leaders of the demonstration was to set up a long-term encampment that would include sleeping, cooking, and continual occupation of multiple tents on Sproul Plaza.  (Holmes Decl. ¶11, Exh. A [seeking donations for "the encampment" including "tents, blankets, tarps, sleeping bags, cooking supplies, camp stoves, electrical workarounds, food, medical supplies…"].)  That there was no "camping" occurring at the time the police ordered protestors to disperse and began trying to move them, as Plaintiffs have argued,[10] does not make action to stop people from putting up tents improper.

Even if the tents were being used as a symbol, it is reasonable for a police officer "to believe that the plaintiffs' tent was being used both as a sign of protest and an abode" and to enforce a no-camping regulation even if there was "no visible sleeping/living equipment inside or around the tents."  *Dukore v. District of Columbia*, 970 F. Supp. 2d 23, 30 (D.D.C. 2013) *aff'd,* 799 F.3d 1137 (D.C. Cir. 2015) (internal quotation marks omitted).  If it is "not unreasonable for the individual defendants to believe that [a] tent was being used both as a sign of protest and an

---

[10] Very few people in the large group of protestors were putting up tents.  Only two people were found inside the tents, and they elected to be arrested after being warned and given an opportunity to leave.  (Celaya Report at 3.)

United States District Court
Northern District of California

1  abode….the individual defendants are entitled to qualified immunity" for their enforcement of

2  existing rules against camping.  *Dukore*, 970 F. Supp. 2d at 30.

3      The Court finds that the defendants were not objectively unreasonable in believing they

4  could prohibit erection of tents on Sproul Plaza, and could enforce their policies and procedures to

5  prevent protestors from taking steps toward setting up an encampment, without violating

6  Plaintiffs' First Amendment rights.  They are therefore entitled to qualified immunity from

7  liability for the First Amendment violation claims.

8      The UC Administrator Defendants' motion for summary judgment as to the First

9  Amendment claim is therefore **GRANTED**.

10      **B.    Excessive Force Claims**

11      Plaintiffs' Third Amended Complaint alleges claims for excessive force in violation of the

12  Fourth Amendment, including direct claims against specified defendants in their individual roles,

13  and indirect claims against specified defendants for their role as supervisors.  Eight plaintiffs have

14  direct excessive force claims: (1) Christopher Anderson against Defendants Buschhueter,

15  Obichere, Rodrigues, and Lachler; (2) Joshua Anderson against Buckout and Obichere; (3)

16  Morgan Crawford against Armijo, Obichere, and Lachler; (4) Joseph Finton against Garcia; (5)

17  Anthony Morreale against Armijo and Obichere; (6) Erick Uribe against Tucker; (7) Taro

18  Yamaguchi-Phillips against Decoulode; and (8) Colleen Young against Garcia and Wilson.[11]

19      With respect to the indirect claims, Plaintiffs alleged that: (1) Defendants Birgeneau,

20  Breslauer, and Celaya were part of the chain of command that ordered police to attack peaceful

21  protestors; and (2) Defendants Birgeneau, Breslauer, Celaya, Le Grande, Williams, and Holmes

22  planned a violent police response to the protest, as well as concurring in, witnessing, and failing to

23  stop assaults against Plaintiffs.  As to Defendants Celaya, Tejada, DeCoulode, Tucker, and

24  Rodrigues, Plaintiffs also alleged claims against them as supervisors who gave orders to the police

25  officers in the field who then inflicted excessive force on certain plaintiffs.

26      The Court first examines the direct claims for use of excessive force.

27  _____

28  [11] Additional direct excessive force claims were previously dismissed from the Third
Amended Complaint for failure to state a claim.  (Dkt. No. 344.)

1

## 1.   *Direct Claims for Excessive Force*

2   In a direct claim for excessive force under the Fourth Amendment, summary judgment in

3   favor of defendants is appropriate if, taking the facts in the light most favorable to the plaintiff, no

4   reasonable jury could find that the defendants' conduct violated a constitutional right.  *Saucier v.*

5   *Katz,* 533 U.S. 194, 201 (2001).  Claims for excessive force are analyzed under the Fourth

6   Amendment's prohibition against unreasonable seizures,[12] using the framework set forth by the

7   Supreme Court in *Graham v. Connor,* 490 U.S. 386 (1989).  The reasonableness of a use of force

8   depends upon whether the defendant's actions are "objectively reasonable" taking into account all

9   the facts and circumstances.  *Graham,* 490 U.S. at 397.  The objective reasonableness standard

10  balances: (a) "the nature and quality of the intrusion on the individual's Fourth Amendment

11  interests" against (b) "the countervailing governmental interests at stake."  *Id.* at 396 (citing

12  *Tennessee v. Garner,* 471 U.S. 1, 8 (1985)); *see also Miller v. Clark County,* 340 F.3d 959, 964

13  (9th Cir. 2003) (court balances "the gravity of the particular intrusion on Fourth Amendment

14  interests" and to determine whether the conduct was constitutionally reasonable).  In *Graham,* the

15  Supreme Court indicated that relevant factors in evaluating the government's interest in the use of

16  force would include: (i) whether the plaintiff posed an immediate threat to the safety of the

17  officers or others; (ii) the severity of any crime at issue; (iii) whether the plaintiff was "actively

18  resisting arrest or attempting to evade arrest by flight;" and, under some circumstances, (iv) the

19  availability of alternative methods of subduing the plaintiff.  *Graham,* 490 U.S. at 396; *Miller*, 340

20  F.3d at 964.  The Court discusses and balances the *Graham* factors below.

21  *a.* Graham*: Nature and Quality of the Intrusion*

22  Plaintiffs' evidence indicates that officers used their hands and their batons to strike them,

23  shove them, or restrain them, in many cases striking them in sensitive and dangerous areas.  A

24  police officer's use of baton blows, physical holds, and punches with a closed fist each constitute a

25  "significant use of force that is capable of causing pain and bodily injury, and therefore... [is]

26  considered a form of 'intermediate force.'"  *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1162

27

28  [12] The Court notes that the Fourth Amendment right to be free of an unreasonable seizure is separate and distinct from the First Amendment right to freedom of expression.

United States District Court
Northern District of California

(9th Cir. 2011); *see also Russell v. City & Cty. of San Francisco*, No. C-12-00929-JCS, 2013 WL 2447865, at *10 (N.D. Cal. June 5, 2013) (punches). "'[I]ntermediate force,' while less severe than deadly force, has been held to be a significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d at 1161; *see also Smith v. City of Hemet*, 394 F.3d 689, 701-02 (9th Cir. 2005). "[I]ts use against an individual is a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest." *Young*, 655 F.3d at 1162-63.

Plaintiffs all testify that they were hit with baton blows from various individual officers.[13] Plaintiff Christopher Anderson declares that he was hit by multiple officers: in the arm, thigh, stomach, ribs and legs in the afternoon (by Lachler, Wong, Buschhueter and Miller) and in the torso, limbs, and face in the evening (by Obichere and Rodrigues). (C. Anderson Decl. ¶¶ 7, 9, 13, 18, 19.) Plaintiff Joshua Anderson submits evidence that ACSO Deputy Buckout grabbed him by the head with both hands, swung him around and put him in a headlock while another office hit him in the groin with a baton. He also testifies to being hit on his leg with a baton so hard that it bent the key in his pocket. (J. Anderson Decl. ¶¶ 6, 7, 10, 17, 18, 20 24, 25.) Plaintiff Colleen Young submits evidence that she was struck by an officer and shoved down a set of stairs. (Young Decl. ¶¶ 11, 14.) Plaintiff Morgan Crawford declares that he was jabbed with a baton repeatedly by Officer Lachler during the afternoon, and was struck in the face and leg several times by Officer Obichere, and jabbed by Officer Armijo, in the evening. (Crawford Decl. ¶¶ 11, 15, 16.) Other plaintiffs testify that officers struck them with batons to the face, neck, chest, groin, collarbone, stomach, mouth, arms, kidneys/low back, and ribs. (*See, e.g.*, Uribe Decl. ¶¶ 13, 14, 17, 22, 30, 34; Tombolesi Decl. ¶ 10; Morreale Decl. ¶¶ 15, 16, 18; Lynch Decl. ¶¶ 29, 31;

---

[13] Lachler's video forensic expert reviewed the video footage and found that none of her baton blows made contact with Christopher Anderson and only three made contact with Crawford. However, Anderson and Crawford both aver that they were hit by Lachler, based on their own review of the same video recordings and their recollection of being struck by a female officer. Lachler's expert's declaration is not dispositive on this question.

1    Escobar Decl. ¶ 13; Crawford Decl. ¶¶ 11, 17; Felarca Decl. ¶¶ 15, 19; Finton Decl. ¶¶ 7, 8; Helm

2    Decl. ¶ 12; McDonald Decl., ¶¶ 9, 10, 11; Yamaguchi-Phillips Decl. ¶ 9.)[14]

3          UCPD's "Crowd Management Policy" states that impact weapons may be deployed to

4    disperse a crowd at the direction of the commander, and specifically contemplates "moving a

5    crowd" with such tactics. (Decl. of Lachler, Exhibit A, pp. 8, 9, 10.)  The policy indicates that a

6    typical outdoor demonstration only calls for standard uniform, but that a "crowd control situation"

7    may prompt the commander to require "crowd control" impact weapons and helmets.  (*Id.* at 9.)

8    At the discretion of the commander, officers may use crowd control impact weapons to disperse a

9    crowd, and the commander is to ensure that a clear path is available for th[o]se who wish to leave

10   the area prior to and during the deployment" of such weapons.  (*Id.* at 9.)[15]

11         UCPD's "Use of Impact Weapon" policy indicates that batons are designated as "crowd

12   control impact weapons." (Decl. of Lachler, Exhibit C, p. 1.)  The policy states that such weapons

13   shall be "used when reasonable for crowd control [and] self-defense."  (*Id.* at 2.)  The policy states

14   that "[a]n impact weapon [like a baton] shall *only* be used when other means of lawful force have

15   failed, are not available, or are not suitable."  (*Id.* at 2, emphasis supplied.)  The policy further

16   states that, when an officer is "a member of a tactical squad in a crowd control situation, an impact

17   weapon may be used to move, separate, or disperse people, or to deny them access to an area or

18   structure."  (*Id.*)  The policy prohibits using a baton to strike the head, spinal column, or throat

19   absent justification for deadly force, and directs officers to avoid the areas of the heart, xyphoid

20   process, groin, and kidney. (*Id.* at 3.)  The policy generally limits the use of impact weapons to

21   situations where the officer is in danger, the individual is suspected of a violent crime and will not

22   comply with the officer's directions prior to searching or handcuffing, the officer is confronted by

23

24         [14] Plaintiff Honest Chung, who at the time of the protest was recovering from a broken leg
     and wearing a walking boot/brace, testified that an officer "hit me over and over, 3-5 times in 5
25   seconds, then after a pause, he hit me another 7-8 times," striking at the arms and ribcage, and
     hitting so hard that a soda can in Chung's backpack burst.  (Chung Decl., Dkt No. 452-4, ¶ 7.)
26   Chung collapsed from the pain and was taken to the emergency room.  (*Id.* at 8.)

27         [15] The policy considers "non-violent opposition" to the directions of law enforcement to be
     "passive resistance" and defines "active resistance" as including "tensed muscles, interlock[ed]
28   arms/legs, pushing, [and] kicking." (Decl. of Lachler, Exhibit A, p. 15.)

United States District Court
Northern District of California

1  multiple suspects making credible threats of assault, or similar circumstances warrant use of an

2  impact weapon and weaponless techniques have failed.  (*Id.* at 2-3.)

3           Along those same lines, ACSO deputies testified that their policies dictate the levels of

4  force that can be used to move a crowd, including the different baton strikes permitted in different

5  circumstances.  (*See* Armijo Depo. 67-69, 72.)  The ACSO policy provides "Deputies shall not

6  intentionally deliver blows, strikes from a baton, expandable baton, or billy to a person's head,

7  neck, throat, groin, kidney, xiphoid process areas, or directly into the heart.  Exception: When a

8  deputy's life is in peril and the use of lethal force is justifiable."  (Obichere Depo. at 55.)

9           The evidence offered by Plaintiffs indicates multiple baton strikes to each of them, some in

10  areas expressly prohibited under UCPD and ACSO policies, given that no evidence has been

11  proffered that any officer's life was in peril.  While Defendants question whether some of the

12  injuries received by Plaintiffs were a result of a police officer's use of force, rather than injuries

13  caused by others in the crowd of the protest, the evidence offered by Plaintiffs as to the *nature* of

14  the force used is largely unchallenged by Defendants.  The Court thus proceeds to analysis of the

15  government's interests by using the other *Graham* factors to determine whether the force used was

16  reasonable.

17                    *b.*      Graham*: Governmental Interests*

18                         i.      Immediate threat to the safety of the officers or others

19  "Of the three [*Graham*] factors we traditionally examine in determining the governmental

20  interest, the most important is whether the individual posed an immediate threat to officer or

21  public safety."  *Young*, 655 F.3d at 1163.  However, "a simple statement by an officer that he fears

22  for his safety or the safety of others is not enough; there must be objective factors to justify such a

23  concern." *Deorle,* 272 F.3d at 1281; *see also Young*, 655 F.3d at 1163; *Graham,* 490 U.S. at 396

24  (reasonableness judged from the objective perspective of a reasonable officer in those

25  circumstances, not subjective perspective).

26           Defendants assert that Plaintiffs, and the protestors generally, posed an immediate threat to

27  the officers' safety.  Defendants submit evidence that Joshua Anderson, Erick Uribe, and Taro

28  Yamaguchi-Phillips pushed into officers and that Erick Uribe attempted to grab an officer's baton

and kicked at an officer.  (*See* UC ES Fact 56, 57).[16]  However, all three state that they did not attack or threaten any police officer verbally or physically.  (Yamaguchi-Phillips Decl. at ¶ 13; Uribe Decl. ¶ 39, C. Anderson Decl. ¶ 20, J. Anderson Decl. ¶ 31; *see also* Morreale Decl. ¶ 21 [never kicked, never saw anyone else do so]; Crawford Decl. ¶ 12 [never saw anyone try to grab a baton or otherwise attack police]; Finton Decl. ¶ 10 [he never attacked or threatened officers physically or verbally and never saw others do so]; McDonald Decl. ¶ 14 [never hit, threw anything, or tried to hurt officers, never saw anyone else do that].)

Armijo testified that he observed some protestors in the crowd wearing their backpacks on their front which he perceived as "an act of resistance and a potential to assault me and my fellow [officers]."  (ACSO Exh. J., Dkt. No. 434-9, Armijo Depo, at 82.)  Armijo also testified that he delivered several straight strikes and jab strikes to protesters because they got so close to him that he feared for his personal safety.  (Armijo Depo. at 82, 86.)

In addition, Defendants offer evidence that Christopher Anderson, during the afternoon events and in response to a police officer's order to "move back" responded that the officer should move back because there were more protesters than officers.  Anderson denies ever being verbally or physically aggressive toward any police officer, or ever taunting any officer.  (Anderson Decl. at ¶ 20.)  There is, at least, a triable issue of fact as to whether any statement made by Christopher Anderson, or the conduct and statements of other plaintiffs, objectively indicated a physical threat.

---

[16]  The Court's review of the evidence indicates that some of these "kicks" and "grabs" may have been attempts to deflect baton blows, to the legs and elsewhere, or to prevent officers from hitting other protestors.  (*See* Morreale Decl. at ¶ 18 [had one leg up to try to prevent a further baton blow when officer hit him in the genitals]; Uribe Decl. at ¶ 17 [reached out to block baton blows to the head of a fellow protestor].)  When the use of force is excessive, persons subjected to it are not, in all instances, required to submit to that force and refrain from actions to protect themselves from injury.  *See United States v. Span*, 75 F.3d 1383, 1389 (9th Cir. 1996) ("there is a right to resist an excessive use of force by an officer"); *Young,* 655 F.3d at 1164 ("[t]his court has recognized that an officer's 'provocative conduct' can trigger an individual's 'limited right to offer reasonable resistance,'" citing *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 921 (9th Cir.2001)); *see also Hooper v. Cty. of San Diego,* 629 F.3d 1127, 1132 (9th Cir. 2011) (whether plaintiff resisted arrest in violation of Cal. Penal Code § 148(a)(1) is a separate issue from whether officer used unreasonable force during same encounter).

Defendants further argue that, because Plaintiffs were attempting to prevent removal of the tents, they were posing an immediate threat to the safety of others.  That argument fails on its face.  Any "danger" posed by tents or encampment was not *immediately threatening* to anyone's safety.

While Defendants describe certain plaintiffs, and the protestors generally, as aggressive and threatening, the objective evidence of immediate danger to the officers is equivocal.  And, as to the majority of the plaintiffs here, Defendants offer no specific evidence that they presented a threat to any officer.

ii.    Severity of any crime at issue

Next, "in determining whether there is a sufficiently strong governmental interest to justify a given use of force [the Court] must consider the severity of the crime at issue."  *Young*, 655 F.3d at 1164 (internal quotation omitted).  Defendants proffer is that Plaintiffs resisted orders to disperse or move, and interfered with lawful police activities including, in a few circumstances, police efforts to arrest protestors.  Of the five Plaintiffs who were actually arrested, their arrests were all for misdemeanor violation of California Penal Code section 148(a)(1), willfully resisting, delaying, or obstructing any police officer "in the discharge or attempt to discharge any duty of his or her office or employment."  No other crimes are asserted.

While Defendants contend that "protestors" erected tents, contrary to University regulations, they offer no evidence that any of the Plaintiffs here did so.  *Cf. Valiavicharska v. Celaya*, No. CV 10-4847 JSC, 2011 WL 6370059, at *9-10 (N.D. Cal. Dec. 19, 2011) (use of force not justified as a response to failure to obey an order, even if a warning was given that force would be used if the order was disobeyed, without evidence of threat to officer).  Even assuming the crimes of other protestors could justify the use of force against Plaintiffs, the severity of the crimes at issue here is relatively low.

iii.    Actively resisting arrest or attempting to evade arrest by flight

With respect to the issue of resisting or evading arrest, Defendants offer evidence that Plaintiff Yamaguchi-Phillips resisted arrest (Decoulode Decl. ¶¶ 34-36), but not that other plaintiffs here resisted arrest or attempted to evade arrest by flight.  At least one plaintiff testified that they were prepared to be arrested as part of the protest.  (*See* Stumpf Decl. ¶ 5-7.)

23

Defendants mainly contend that the protestors and Plaintiffs were "actively resisting" (rather than passively resisting) orders of the officers, and that "active resistance" justifies use of physical force to overcome that resistance.  The notion that any "active resistance" to the orders of the police justifies use of physical force is not supported by the authorities Defendants offer, most particularly *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001).  In *Jackson*, it was not mere "active resistance" of the group that made the level of force employed reasonable, but instead it was: physical altercations with the police officers; physical interference with the officers' attempt to arrest a fleeing suspect who had an outstanding felony warrant; and an out-of-control scene that the plaintiff herself described as a "melee."  *Jackson*, 268 F.3d at 652-53.  The threats to officers' safety and attempt to evade arrest were significant factors supporting a finding of no excessive force.  Thus, *Jackson* does not stand for the proposition that disobeying orders to disperse and shouting at police officers, without more, would constitute "active resistance" or justify use of physical force to overcome that resistance.

As the Ninth Circuit has admonished, resistance "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer. We must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).  In considering what level of resistance will support use of force, the Ninth Circuit has held repeatedly that "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (citing cases).  This is true "even when the extent of the resistance [is] substantially greater than…failure to disperse." *Id.; see, e.g., Young, supra,* 655 F.3d at 1165–66 ("passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others…will not, without more, give rise to a governmental interest in the use of significant force"); *Davis v. City of Las Vegas,* 478 F.3d 1048, 1055–56 (9th Cir. 2007) (arrestee's actions in physically impeding the officer's search of his pockets was not active resistance); *Smith v. City of Hemet,* 394 F.3d 689, 703 (9th Cir. 2005) (*en banc*) (arrestee's refusal to remove hands from pockets and his reentry of his home despite

United States District Court
Northern District of California

United States District Court
Northern District of California

officers' orders to place hands on head and walk towards them was not active resistance); *Forrester v. City of San Diego,* 25 F.3d 804, 805 (9th Cir. 1994) (finding that protestor's "remaining seated, refusing to move, and refusing to bear weight" despite police orders to the contrary constituted "passive resistance").  Even when a person is "not perfectly passive," if their resistance is not "particularly bellicose…the third *Graham* factor offer[s] little support for the use of significant force."  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) (internal citation omitted).

So, for example, the Ninth Circuit has held that nonviolent protestors who locked themselves together with a metal "black bear" locking device and refused orders to unlock were not engaged in "active resistance." *Headwaters Forest Defense v. County of Humboldt,* 276 F.3d 1125, 1131 (2002).  Thus, use of pepper spray to move the protestors was excessive force.  *Id.*  Along those same lines, the Ninth Circuit in *Bryan* held that a suspect in a routine seatbelt traffic stop who failed to comply with an order to remain in his car, began shouting gibberish, and then proceeded to hit himself in the quadriceps was not engaged in "resistance" at all, and use of physical force (a taser) to effect the arrest was unreasonable.  *Bryan*, 630 F.3d at 830.

Here, Celaya says he did not witness any excessive force and that he believed the use of hands and batons was reasonable under the circumstances, given that there was a large group of protestors and that some protestors had shown "active resistance" to the police operation.  (Celaya Decl., Dkt No. 387-13, ¶ 34.)  At the same time, Celaya avers that he did not order any police officer to use force, or any particular level or type of force, in removing the encampment planned for November 9, other than to order that pepper spray "was not to be used indiscriminately or as a first effort to disperse a crowd."  (*Id.* at ¶ 38.)

The UC Defendants' expert, Cameron, offers opinions, based on his review of videos and deposition testimony, that: (a) several plaintiffs (Joshua Anderson, Justin Tombolesi, Benjamin Lynch, Erick Uribe, Liana Mulholland, Yvette Felarca, Christopher Anderson and Morgan Crawford) were assuming an "aggressor role" in the afternoon protest; (b) Joshua Anderson blocked the path of police officers trying to access the tents; (c) Erick Uribe pushed officers, grabbed at an officer's baton, and kicked at officers; and (d) Taro Yamaguchi-Phillips blocked the

path of police officers and interfered with their attempts to detain a woman standing next to him. (Cameron Decl., Dkt. No. 387-19, ¶ 7-10.)  Cameron opines that all of this conduct constituted "active resistance."  (*Id*. at 11.)  Cameron opines that officers are trained that baton techniques of "port arms pushing, tip end jabbing, shift striking, and chopping are trained and P.O.S.T.-approved techniques that are reasonable uses of force *when used against actively resistant individuals* who refuse to obey lawful police orders and interfere with and delay officers." (Cameron Decl., Dkt. No. 387-19, ¶ 14, emphasis supplied.)  He opines that the baton techniques officers used were appropriate, given the totality of the circumstances the officers faced.  (*Id*. at ¶ 17.)  The opinion, aside from being conclusory, assumes that the level of resistance demonstrated by all plaintiffs was "active resistance" such as would justify use of physical force, a conclusion appears at odds with the case law cited above.

Moreover, the Defendants' arguments attempt to justify the force used with broad statements about "protestors."  While the group of protestors was large and the scene was chaotic, the size of the group alone does not justify treating all individuals as an undifferentiated single entity for purposes of determining what force was reasonable to employ.  *See Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (although others were throwing bottles and debris at officers, "[t]hese individuals were observed prior to the officers' use of force and were seen not to be engaged in any violent conduct… the general disorder of the complex cannot be used to legitimize the use of pepperball projectiles against non-threatening individuals.")

On summary judgment, the Court must view the evidence in the light most favorable to the Plaintiffs.  Some Plaintiffs indicated that they heard dispersal orders or understood that the crowd had been told to disperse, and some did not.  Some testified that they were unable to leave or to move, despite police orders to do so.  The evidence here does not indicate officers used batons for the purpose of effectuating arrests of these Plaintiffs.  It does not indicate that Plaintiffs were striking officers or were armed or brandishing weapons.  To the contrary, the evidence indicates that Plaintiffs' resistance was, in the main, limited to refusing to move, linking arms, and yelling at officers.  While UC's expert, Cameron, reviewed the testimony and videos and opines that some of the Plaintiffs here grabbed officer's batons, pushed officers, or *kicked at* officers (not actually

United States District Court
Northern District of California

26

*kicked* officers), Plaintiffs' evidence contradicts those assertions.  There are, at least, triable issues of fact as to the level of resistance actually engaged in by the plaintiffs here, and whether it weighed in favor of the level of force used, per *Graham*.

iv.   <u>Availability of alternative methods</u>

Although officers "are not required to use the least intrusive degree of force possible," *Forrester,* 25 F.3d at 807, "the availability of alternative methods," *Smith,* 394 F.3d at 701, is a relevant factor in determining whether the amount of force used was reasonable.  *Nelson*, 685 F.3d at 882.  Here, the evidence does not indicate that officers considered the availability of alternative methods short of use of physical force.  Birgeneau and the CMET had ordered that pepper spray or tear gas only be used as a last resort, essentially taking them off the table as alternatives.  There is insufficient evidence on this factor to favor the use of the level of force employed here.

v.   <u>Whether a warning was given</u>

The Ninth Circuit has held that "the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Nelson,* 685 F.3d at 882 (citing *Deorle,* 272 F.3d at 1284).  Tejada's statement about the warnings he gave was that, in the afternoon, he "informed the crowd that because they were engaging in the unlawful activity of camping on campus, it was an unlawful assembly" and in the evening, he used "a bullhorn to read a dispersal order to the crowd."  (Tejada Decl., Dkt. No. 432-2, ¶¶ 20, 32.)  The warnings he gave "(i) commanded the crowd to move back, (ii) commanded the crowd to comply with the orders of the police, and (iii) commanded the crowd to not resist the police."  (*Id*.)  He "also informed the crowd that it was an unlawful assembly and that they were subject to arrest if they did not immediately disperse." (*Id.*)

UCPD's own Crowd Management Policy provides examples of dispersal orders, which all include stating dispersal routes and warn the persons gathered of the consequences.  (Lachler Decl., Exh. A at 10.)  The policy also indicates that multiple warnings should be given, using multiple methods, depending up on the circumstances.  (*Id*.)  Here, like *Nelson*, there is evidence that would permit a jury to find that Plaintiffs and other protestors were not able to hear dispersal orders. (*See* C. Anderson Decl. ¶¶ 5, 17; Helm Decl. ¶ 10; Felarca Decl. ¶ 7; Escobar Decl. ¶ 12;

United States District Court
Northern District of California

1   Crawford Decl. ¶ 9; Young Decl. ¶ 10; McDonald Decl. ¶ 13; Wagaarachchi Decl. ¶ 5; Uribe

2   Decl. ¶ 27; Tombolesi Decl. ¶ 6; Mulholland Decl. ¶ 9.)  The record does not indicate that the

3   protestors or Plaintiffs were told how they could exit to comply with the order.  Several Plaintiffs

4   testified that they were blocked from leaving. (*See* Kingkade Decl. ¶ 7; Helm ¶ 10; Young Decl.

5   ¶¶ 17, 18; Yamaguchi-Phillips Decl. ¶ 10; Uribe Decl. ¶¶ 10, 32.)

6       In sum, viewing the evidence in the light most favorable to Plaintiffs, each of the *Graham*

7   governmental interest factors does not support a finding in favor of Defendants.  Considering

8   those factors along with the nature of the intrusion, *Graham* is not satisfied.[17]

9                           *c.  Qualified Immunity*

10       Even if a court determines that the conduct was not constitutionally reasonable, a

11   defendant may still prevail under the doctrine of qualified immunity unless the right at issue was

12   "clearly established" at the time of the conduct at issue.  *Pearson v. Callahan,* 555 U.S. 223, 232

13   (2009).  In undertaking the qualified immunity analysis, first a court must consider whether the

14   facts, take in the light most favorable to the party asserting injury, show that the officer's conduct

15   violated a constitutional right.  *Saucier*, 533 U.S. at 201.  However, even if a constitutional

16   violation is found, a government official is immune from liability unless the constitutional right

17   violated was clearly established at the time of the wrongful conduct.  *See Ashcroft v. al–Kidd,* 563

18   U.S. __, 131 S.Ct. 2074, 2080 (2011).  A right is clearly established if "a reasonable official would

19   understand that what he is doing violates that right."  *Anderson v. Creighton,* 483 U.S. 635, 640

20   (1987).  Qualified immunity thus "gives government officials breathing room to make reasonable

21   but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly

22   violate the law.'"  *al-Kidd,* 131 S.Ct. at 2085 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

23   _____

24       [17] Defendant Lachler moved separately for summary judgment on the claims against her,
     contending that Plaintiffs Anderson and Crawford actively resisted orders to disperse and to move

25   by linking arms, pushing back toward the officers, and making angry faces, such that she had "had
     the lawful right to use physical force to effectuate compliance with a lawful order." (Lachler Decl.

26   ¶¶ 23-25.)  Her motion also contends that her baton strikes as to Anderson and Crawford were
     minimal.  The evidence in the record, including Anderson and Crawford's declaration and

27   deposition—listing baton strikes by Lachler to their arms, stomachs, ribs, and legs, and denying
     active resistance or threatening conduct—create triable issues of fact as to the reasonableness of

28   Lachler's use of force.

United States District Court
Northern District of California

United States District Court
Northern District of California

On summary judgment as to qualified immunity, as in other contexts, the evidence is viewed in the light most favorable to the non-moving party. *See KRL v. Estate of Moore*, 512 F.3d 1184, 1189 (9th Cir. 2008) ("[w]here disputed facts exist, we assume that the version of the material facts asserted by Plaintiffs, as the non-moving party, is correct.") (citing *Jeffers v. Gomez,* 267 F.3d 895, 903 (9th Cir.2001)).

Defendants argue that the force they used was objectively reasonable and that no clearly established 4th Amendment precedent prohibits the use of such "minimal" force to effectuate compliance with a police officer's orders, to overcome "active" resistance to those orders, and to maintain control over a large crowd. Thus, Defendants contend that none of them knowingly violated the law.

The Court finds that there are triable issues of fact that preclude a finding of qualified immunity. The constitutional right to be free of physical blows from hands or batons, or from a chokehold, as a response to failure to a police officer's order to disperse—and in the absence of evidence of a threat to the officer, a serious crime, or attempt to evade arrest—is well established. *See Young*, 655 F.3d at 1168 ("The principle that it is unreasonable to use significant force [*i.e.,* pepper spray and baton blows] against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest, was thus well-established in 2001, years before the events at issue in this case."); *Headwaters Forest,* 276 F.3d at 1131 (use of pepper spray against protestors, even when they linked themselves together with metal locks and refused to release the locks, was unreasonable); *see also P.B. v. Koch,* 96 F.3d 1298, 1304 (9th Cir. 1996) (school official's "slapping, punching, and choking" students, in the absence of countervailing educational objectives or showing of a need for force, was excessive).

                d.          *Conclusion on Summary Judgment for Direct Excessive Force Claims*

Therefore, summary judgment in favor of defendants on the direct claims for excessive force is **DENIED** with the exception of: (1) the unopposed motion on Yamaguchi-Phillips' claim against Decoulode; (2) the unopposed, withdrawn claim of Young against Wilson; (3) Christopher Anderson's claims against Buschheuter and Rodrigues, officers he did not identify in his deposition, which are **GRANTED**.

United States District Court
Northern District of California

1

### 2. *Indirect Excessive Force Claims*

In the Ninth Circuit, there is "supervisorial liability under § 1983 where the supervisor 'was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation.'" *Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010) (quoting *Jackson v. City of Bremerton,* 268 F.3d 646, 653 (9th Cir.2001)).  "Thus, supervisors 'can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others.'" *Edgerly*, 599 F.3d at 961 (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)); *see also Maxwell v. County of San Diego,* 708 F.3d 1075, 1086 (9th Circ. 2013) ("[a] supervisor is liable under § 1983 for a subordinate's constitutional violations if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them") (internal quotation omitted).  To impose supervisory liability under section 1983, the state actor must "recognize[ ] [an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Grubbs,* 92 F.3d at 899 (internal quotation marks omitted).  In other words, the defendant "knows that something *is* going to happen but ignores the risk and exposes [the plaintiff] to it." *Id.* at 900.  "The deliberate indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Patel,* 648 F.3d at 974 (citing *Wood v. Ostrander,* 879 F.2d 583, 588 n. 4 (1989)).

The Court first addresses summary judgment as to Plaintiffs' indirect claims against the UC Administrator Defendants, and then turns to Plaintiffs' indirect claims against the police supervisor Defendants.

### a. UC Administrator Defendants

The UC Administrator Defendants affirmatively sought summary judgment on Plaintiffs' excessive force claims based upon supervisory liability.  (Dkt. No. 387.)  Plaintiffs allege the UC Administrators are liable for their supervisory role in directing or managing the University's response to the protest, including the police operations resulting in the direct acts of excessive

United States District Court
Northern District of California

force against them.  Defendants argue that: the force used was reasonable, relieving them of any indirect liability for that use of force; they have no liability because they were not personally involved in the alleged use of excessive force; and Defendants LeGrande, Williams, and Holmes were not within the police chain of command and could not direct any details of the officers' conduct.  They also argue that no administrator had reason to believe that enforcement of their no-encampment policy would lead to use of excessive force by the police officers.  And finally, they argue that qualified immunity precludes a finding of their liability.

i. Supervisor Liability

The UC Administrators present evidence that they did not witness the afternoon police operation to disperse the crowd and remove the tents.  Likewise, the Administrators aver that, other than Police Chief Celaya, they were not present for and did not otherwise witness or see accounts of the evening police operation until many hours after it had concluded.  Celaya represents that he observed the evening police operation from a balcony across the Plaza, but could not see individual officers' actions.  All of them aver that they did not believe any excessive force was or would be used.

Plaintiffs contend that the Administrator Defendants are liable for excessive force for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury, or for conduct that shows a reckless or callous indifference to the rights of others.  *See Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (supervisors may be liable for their own culpable action or inaction in the training, supervision, or control of subordinates, acquiescence, recklessness or callous indifference to the rights of others, and may be also be liable if there is a sufficient causal connection between their conduct and the constitutional violation, such as by setting in motion a series of acts by others, by knowingly refusing to terminate those acts when the supervisor knew or reasonably should have known that the acts would cause others to inflict a constitutional injury.)

In the Court's analysis, the evidence regarding the role and responsibility of the UC Administrators, their knowledge of the situation that was developing, the risks the situation

31

entailed based upon past occurrences, and their lack of action, is sufficient to create a triable issue of fact as to their liability as supervisors under section 1983.

In their planning for the University's response to the November 9 demonstration, Breslauer testified that the members of the CMET "stipulated" that the police could use batons to enforce the no encampment policy, though they did not get into a discussion of how the police could use the batons specifically.  (Breslauer Depo. at 62-64.)  The Administrator Defendants were aware police officers had used batons on protestors in order to gain access to the tents and carry out the no-encampment policy, and that people had been injured.  (UC Admin Exec. Summ. ¶ 32 and evidence cited therein.)  The Administrator Defendants contend that they did not believe this use of force was excessive because use of batons is an appropriate level of force when confronting "active resistance" from protestors in order to access the tents and to maintain a perimeter to remove the tents.  (UC Admin Exec. Summ. ¶¶ 28, 39.)  Although each of the UC Administrator Defendants contends that they had no reason to believe use of the police officers' use of batons on the day of the protest was excessive force, each of them also states that they had not observed or obtained specific information about the interaction between the police and the protestors.[18]

In terms of their administrative roles, Chancellor Birgeneau regarded Breslauer as being the "ultimate decisionmaker" on November 9 since the Chancellor himself was in China at the time.  (Birgeneau Depo. at 222, 264.)  Breslauer indicated the CMET, and specifically Claire Holmes and Harry LeGrande, shared decision-making responsibilities that day, though he conceded that he was the person people might consult if they "had to make a really big decision." (Breslauer Depo. at 71-73.)  Holmes testified that Williams was "in charge of the CMET from an administrative point of view," and in charge of gathering information and scheduling meetings.

---

[18] Further, the Administrator Defendant's position implicitly indicates they were on notice that use of batons *would be excessive* in confronting individuals who were *not* actively (*i.e.*, passively) resisting police orders.  *See Bates v. Arata*, No. C05-3383 SI, 2008 WL 820578, at *13 (N.D. Cal. Mar. 26, 2008) *order clarified sub nom. Bates v. San Francisco Sheriff's Dep't*, No. C 05-3383 SI, 2008 WL 961153 (N.D. Cal. Apr. 7, 2008) ("[b]ased on defendants' statements that they only used force when necessary to compel compliance and discontinued all use of force as soon as plaintiffs complied, the Court finds that defendants were on notice that use of force when plaintiffs were no longer resistant or likely to resist was unnecessary and therefore unlawful.")

1    (Holmes Depo. at 255.)  Holmes was consulting with Williams throughout the afternoon and

2    getting updates about what was happening.  (Holmes Depo. at 264-265.)  Holmes testified that her

3    staff was monitoring the internal "Hub" page for postings—including pictures, videos, tweets, and

4    links to news stories—and reporting back to Holmes.  Williams, for her part, testified that she had

5    concerns about the use of batons on the protestors in the afternoon and the safety of all involved.

6    (Williams Depo. at 98.)

7        By the afternoon, all the UC Administrator defendants knew that the group of protestors

8    with whom Celaya, Williams, and LeGrande had met had rejected their offer to stay on Sproul

9    Plaza round-the-clock without any tents.  They also all knew that there were reports of arrests and

10   injuries to protestors.  No administrator made any plan other than to continue down the path the

11   police had already taken earlier in the afternoon.  And no administrator other than Chief Celaya

12   remained on the campus to keep informed about developments or direct the police response.

13   Breslauer did not designate anyone to be in charge when he left before the evening police action.

14   (Breslauer Depo. at 132:24-134:4.)  Likewise, Williams, Holmes, and Le Grande all left the

15   campus without confirming any administrator was remaining other than the police chief.

16   (Williams Depo., p. 103-104:3; Holmes Depo. at 182-85; Le Grande Depo. at 172.)

17       Further, Plaintiffs' submit evidence that all the Administrator Defendants were aware of a

18   prior Police Review Board ("PRB") investigation and recommendations.  The PRB investigation

19   was convened by Defendants Birgeneau, Breslauer, and Le Grande in the wake of a November

20   2009 protest in which many people in the gathered crowd of supporters were struck by police

21   batons and injured.  (Plaintiffs' Exh. 16 ["PRB Report"]; *see also* Birgeneau Depo. at 130-31.)

22   The PRB was to conduct an "independent investigation" of their handling of the protest with the

23   mission that "[a]ny tactics to exercise crowd control on campus must provide a safe platform for

24   expression of free speech and freedom of assembly and we expect that, as a result of this review,

25   modifications will be made.  We must strive to ensure that there is no possibility in the future of

26   the alleged actions of police brutality and that our actions are guided by non-violence."

27   (Plaintiffs' Exh. 36.)  Williams, on behalf of the UC Administration, had thanked the PRB and

28   accepted the recommendations just weeks before the November 9 protest at issue here. (Plaintiffs'

United States District Court
Northern District of California

33

Exh. 29.)  The recommendations therein were known to the Administrator Defendants at the time they created their Operational Plan of response to the November 9 protest, including the recommendation that the administration designate and maintain at least one civilian administrator in charge during the action. (PRB Report at 111-115.)  Birgeneau testified that the recommendations from the PRB Report included a set of steps for defusing a situation that were supposed to be used prior to use of force.  (Birgeneau Depo. at 217.)  The recommendations of the PRB Report also strongly suggested the University administration establish a clear response protocol for large-scale civil disobedience with a plan to maintain a "line of succession of responsibility" and "assure prompt communication among members" of the response team, including maintenance of "one civilian member of the crisis management team…in the UCPD command post" or some other gathering place.  (PRB Report at 117.)  The PRB Report thus put the UC Administrator Defendants on notice of the need for administrative oversight of the police department's use of force in protest situations.

        In connection with the events at issue here, there is evidence that the UC Administrator Defendants were each aware that batons had been used on protestors in the afternoon, that there had been reports of injuries, and that the gathered crowd was large.  The UC Administrators left the campus with no civilian member of the crisis management team in place during the events of the evening.  Each of the UC Administrators declares that he or she did not believe any excessive force had been used to remove the tents.  However, all of them knew police had used batons in enforcing the no-encampment policy in the afternoon.  Breslauer testified that "minimizing injuries was a good idea, but not to the point of sacrificing the goal of preventing an encampment." (Breslauer Depo. 158:16-19.)  And while the UC Administrators all state that they did not see any of the footage of the police action until the next day, videos and photos of the police action in the afternoon were posted on the Hub, and reported to Holmes, during the course of the day.  (Holmes Depo. at 156:10-158:4; Exh. L, Dkt. 416-16.)

        For the reasons detailed above, the Court cannot find, as a matter of law, that the level of force used by the officers was reasonable under *Graham*.  Thus, the first argument for summary judgment on the Administrator's supervisory claims fails.

United States District Court
Northern District of California

As to the second argument, the UC Administrators' argument misstates the law.  Personal involvement in the conduct alleged to have violated plaintiffs' constitutional rights is not a requirement for holding supervisors liable under section 1983.  *Edgerly*, 599 F.3d at 961 (supervisor liability can be shown by personal involvement or a sufficient causal connection between the supervisor's action or inaction and the constitutional injury).  A failure to act that causes injury is sufficient.  *Id.*

With respect to the final argument—that Holmes, LeGrande, and Williams have no responsibility since they were not in a direct chain of command over police officers—Defendants again seek to impose a limitation on liability not supported by any authority they offer.  These three defendants were the only CMET members on the campus that day.  A triable issue remains as to each person's authority over the UC Administration's response and awareness of the potential constitutional violations that might occur if they failed to act.

The UC Administrators contend that they had no reason to believe that enforcing the no-encampment policy would lead to the use of excessive force.  The Court disagrees.  The evidence in the record indicates that the police response to a similar protest had, in the past, led to injuries and concerns sufficient to warrant the PRB investigation.  It indicates that the UC Administrators knew that the police had used batons on protestors in the afternoon without the administrators having any information to suggest that this level of force was reasonable.  Further, issues remain regarding the extent of the UC Administrators' knowledge of the use of force by police, injuries that resulted in the afternoon, and whether they deliberately or recklessly failed to take action to change course in the evening.

### ii.    Qualified Immunity

Finally, the UC Administrator Defendants also contend that the doctrine of qualified immunity bars any claims for damage for civil rights violations under section 1983 against administrators in supervisory positions over University police officers.  Qualified immunity would shield these defendants from liability unless they "had fair notice that the force employed was unlawful, and that any mistake to the contrary would have been unreasonable."  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003).

United States District Court
Northern District of California

Viewing the evidence in the light most favorable to the Plaintiffs, as the Court must on summary judgment, the UC Administrator Defendants are not entitled to summary judgment on qualified immunity on the excessive force supervisory claims.  As set forth above, the Fourth Amendment right to be free from baton blows, chokeholds, and similar physical force in the absence of a governmental interest warranting such force was well established at the time of this incident.  Triable issues of fact exist as to whether reasonable government officials in their position would have understood that: (1) the police officers' use of batons and other physical force on the protestors in the afternoon to enforce the no-encampment policy was unreasonable, and (2) the UC Administrators' own inaction and abandonment of the campus in the evening created an unreasonable risk that the police officers would act in violation of the Fourth Amendment rights of the protestors, including Plaintiffs.  *Cf. Bates*, *supra*, 2008 WL 820578, at *13 (denying qualified immunity where defendants recognized that use of force when plaintiffs were not resistant was unnecessary and unlawful, but evidence nevertheless indicated use of force under those circumstances).

### b.    Police Supervisor Defendants

Defendants Tejada, DeCoulode, and Tucker from the UCPD filed cross-motions for summary judgment on Plaintiffs' claims for supervisory liability for excessive force.[19]

First, as a legal matter, Defendants argue that certain Plaintiffs cannot maintain a claim against them for supervisory liability if they have not alleged a claim for direct liability against a particular officer in the complaint.  This argument does not persuade.  While the cases require proof that a subordinate of the supervisory defendant inflicted a violation of rights, those cases do not require that a claim be *pleaded* against that subordinate in order for the supervisor to be liable.  Defendants confuse proof of the subordinate's conduct with a specific claim against the subordinate, which the cases do not require.  *See Jeffers,* 267 F.3d at 915 (supervisor liable if there

---

[19] The ACSO Defendants' motion for summary judgment did not include a motion for summary judgment on the claims against defendant Rodrigues for supervisory liability for excessive force.  Instead, ACSO raised this issue for the first time on reply.  Summary judgment on these grounds is **DENIED**.

United States District Court
Northern District of California

1   is a causal connection between supervisor's conduct and a constitutional violation); *R.H. v. Los*

2   *Gatos Union Sch. Dist.*, 33 F. Supp. 3d 1138, 1154 (N.D. Cal. 2014), *dismissed* (Oct. 29, 2014)

3   (supervisory liability is derivative of claims that individual coaches violated plaintiffs'

4   constitutional rights); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*municipal*

5   liability depends upon showing that individual officer inflicted injury).

6           As to the substance of the claims, Plaintiffs offer evidence to show that Tucker and

7   DeCoulode were directly involved in use of force against them, as well as giving orders to their

8   subordinate officers directing use of force and observing other officers' use of force against

9   Plaintiffs but doing nothing to stop it.  Both Tucker and DeCoulode contend that their uses of

10  force were reasonable under the circumstances, which they testify included Plaintiffs' pushing and

11  shoving, disobedience to their orders, and attempts to grab their batons.  Because there are

12  disputed issues of fact with respect to Tucker and Decoulode's liability as supervisors, summary

13  judgment is **DENIED**.

14          However, Plaintiffs opposition to summary judgment did not directly address defendant

15  Tejada's supervisory liability.  The only evidence offered in opposition indicated that Tejada made

16  an announcement to disperse.  No attempt is made by Plaintiffs to show a causal connection

17  between Tejada's actions or inactions and injury to them.  Because the summary judgment motion

18  is unopposed, the Court **GRANTS** summary judgment to defendant Tejada on the claims of

19  supervisory liability for excessive force.

20          Based on the foregoing, summary judgment in favor of defendants on the claims for

21  supervisory liability of officers DeCoulode and Tucker is **DENIED**.  Summary judgment in favor of

22  Defendant Tejada is **GRANTED** as to supervisory liability for excessive force.

23          **C.      False Arrest Claims**

24          The UC Administrator Defendants and Defendant Tejada filed a cross-motion for summary

25  judgment on claims by Plaintiffs Alvarado-Rosas, Klinger, Morreale, Wagaarachchi, and

26  Yamaguchi-Phillips for false arrest.  These defendants put forward evidence of probable cause for

27  the arrests of each of the arrested plaintiffs.  Plaintiffs did not respond to the cross-motion for

28  summary judgment on the false arrest claims.  Because Plaintiffs have failed to offer evidence to

create a triable issue of fact on these claims, the Court **GRANTS** the cross-motion for summary judgment on these grounds.

**IV.    CONCLUSION**

For the reasons stated herein,

1.  The motion for summary judgment of the UC Administrator Defendants and Defendant Tejada is **GRANTED** on the First Amendment claims and **DENIED** on the claim for supervisory liability for excessive force;

2.  Plaintiffs' motion for summary judgment (Dkt. No. 391) is **DENIED** as Withdrawn.

3.  As to the UC Administrators' cross-motion for summary judgment, the motion is:

(a) **GRANTED** as unopposed with respect to the false arrest claims;

(b)      (*i*) **GRANTED** as unopposed on direct liability against Decoulode and (*ii*) **DENIED** as to direct liability against Tucker because triable issues of fact exist; and

(c)      (*i*) **GRANTED** with respect to supervisory liability of Defendant Tejada and  (*ii*) **DENIED** with respect to supervisory liability of Defendants DeCoulode and Tucker.

4.  On the ACSO Defendants' motion for summary judgment, the motion is:

(a) **GRANTED** as to direct excessive force claims against Buschhueter and Rodrigues;

(b) **GRANTED** as unopposed on direct excessive force claim against Wilson;

(c) **DENIED** as to direct excessive force claims against Obichere by C. Anderson, J. Anderson, Crawford, and Morreale; direct excessive force claim against Armijo by Crawford and Morreale; and direct excessive force claims against Garcia by Finton and Young;

(d) **DENIED** as to supervisory claims against Rodrigues; and

(e) **DENIED** as Moot as to claims not pleaded in the TAC or previously dismissed;

5.  Defendant Lachler's motion for summary judgment is **DENIED**.

This order terminates Docket Nos. 387, 391, 432, 434, and 435.

**IT IS SO ORDERED.**
Dated: January 27, 2016

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT**

38